**UNITED STATES**

v.

**Airman Robert M. GAY, FR 368–58–2616
United States Air Force.**

**ACM 23492.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 15 Dec. 1981.

Argued 8 Nov. 1982.

Decided 3 June 1983.

Appellate Counsel for the Accused: Colonel George R. Stevens, Major William H. Lamb and Captain Daniel J. Jarlenski.

Appellate Counsel for the United States: Colonel James P. Porter, Colonel Kenneth R. Rengert and Major Michael J. Hoover.

Before EN BANC—HODGSON, KASTL, CANELLOS, HEMINGWAY, RAICHLE, MILLER and SNYDER, Appellate Military Judges.

## DECISION

KASTL, Senior Judge:

Applying Supreme Court precedents, we hold in this case that the military system for imposing the death penalty under Article 118(1) of the U.C.M.J., 10 U.S.C. § 918(1) is constitutionally defective. Accordingly, we disapprove that portion of the accused's sentence extending to death.

The accused, Airman Gay, was found guilty of murder and attempted murder of three security policemen, in violation of Articles 80 and 118(1), U.C.M.J., 10 U.S.C. § 880. His sentence, as approved by the convening authority, extends to death, dishonorable discharge, total forfeitures, and reduction to airman basic.

### I

The accused was a 28-year old security policeman assigned to Holloman Air Force Base, New Mexico. On 31 July 1981, his supervisor, Technical Sergeant Rodriguez, gave him a letter of counselling regarding a haircut violation. This angered and agitated the accused. Over a two-day period, he complained to several persons that he was being subjected to unfair and discriminatory treatment. He also expressed his intention to do something about it.

On 2 August, the accused finished an eight-hour shift of duty at 0600 hours; he was joined by Airman Cox at 1000 hours. The two remained together throughout the day. There is evidence that the accused consumed six to nine seven-ounce beers and four to five drinks of whiskey and cola but that he showed no signs of intoxication. As the accused prepared for duty that evening, he told Airman Cox that "when they issue me 120 rounds tonight they will be making

a mistake" and "my mother gets all my stuff."

At approximately 2130 hours, the accused reported for duty at Building 107. He told Sergeant Mobley, in the presence of Sergeant Rodriguez, that he was "going to get" Rodriguez that night. The accused then proceeded to the Security Police armory, where he secured an M–16 rifle assigned to him, 120 rounds of ammunition, and a two-way radio. He then fell into formation for guardmount with 16 to 20 other security policemen.

At the conclusion of guardmount, the accused confronted Sergeant Rodriguez in front of Building 107 with regard to the counselling letter for the haircut violation. When the accused became boisterous and used profanity, Rodriguez broke off the conversation and entered Building 107. He reemerged some minutes later and was proceeding to his assigned vehicle when the accused shouted "turn around you mother fucker, I said turn around." The accused then unshouldered his M–16 rifle and—after shouting again for Rodriguez to turn around—fired his rifle. Sergeant Rodriguez fell to the ground, mortally wounded.

The accused then pivoted to his right, "fanning" his weapon, and fired in the direction of Airman Brockett, who was about seven to ten feet away. Witnesses who ran for cover heard additional shots. Thereafter, Airman Lamberty, who had been standing in front of Building 107, was seen lying on the ground.

A doctor arriving at the scene determined that Sergeant Rodriguez was dead. Airman Lamberty was rushed to the Air Force hospital. Despite frantic efforts to save his life, he was pronounced dead at 2330 hours. The cause of death for both victims was exsanguination brought on by a bullet wound to the abdomen.

A search for the accused was initiated. At approximately 2330 hours he was apprehended near the on-base elementary school. When apprehended, the accused was found in a semi-fetal position, without his weapon, shaking and appearing hysteri-

cal. He was carried to a patrol vehicle and transported to the base hospital.

The case was referred as capital. The court-martial sentenced the accused, *inter alia,* to death; the sentence was approved by the convening authority. The case is now before us for resolution.

## II

In a momentous decision, *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the United States Supreme Court declared unconstitutional the procedures used in Georgia and Texas for imposing the death penalty. Since *Furman* will prove crucial in evaluating military capital punishment procedures, we turn first to historical examination of that case and its aftermath. We shall then apply that precedent to the military system in Part III.

### *The Furman Decision*

*Furman* held that imposition of the death penalty pursuant to state discretionary sentencing statutes in Georgia and Texas constituted cruel and unusual punishment prohibited by the Eighth Amendment, made applicable to the states through the due process clause of the Fourteenth Amendment.

*Furman*'s precise rationale is evasive because, following a terse per curiam announcement, each of the nine justices submitted a concurring or dissenting opinion. To determine the Court's exact teaching—and the effect of *Furman* upon the instant case—the opinions making up the 5–4 majority must be placed into proper perspective.[1]

Justices Brennan and Marshall espoused an abolitionist view, believing the death penalty necessarily cruel and unusual and thus impossible to impose constitutionally.

Concurring on narrower grounds, Justices Douglas, Stewart, and White each found the capital punishment statutes under consideration arbitrary, thereby violating the Eighth Amendment.

Justice Douglas believed it cruel and unusual to apply the death penalty selectively. Statutes authorizing the imposition of death proved unfair in nature and application, "pregnant with discrimination . . . an ingredient not compatible with the idea of equal protection of the laws. . . ." He further reasoned that then-existing capital sentencing procedures provided no standards to govern the life-or-death decision, leaving to judges or juries "uncontrolled discretion," dependent on whim.[2]

Justice Stewart concluded that the death sentences reviewed in *Furman* were "cruel and unusual in the same way that being struck by lightning is cruel and unusual." He asserted that "of all the people convicted of rapes and murders in 1967 and 1968 . . . the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed." The Eighth Amendment, Justice Stewart concluded, "cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed."[3]

Justice White pointed out the infrequency with which the death penalty was adjudged and actually exacted, thus rendering its occasional application an ineffective deterrent. Consequently, the death penalty constituted a "pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes."[4]

---

1. When the United States Supreme Court is fragmented and no single rationale enjoys the assent of five or more justices, the holding is the position of the members concurring on the narrowest of grounds. *See Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

2. *Furman v. Georgia,* 408 U.S. 238, 257, 92 S.Ct. 2726, 2735, 33 L.Ed.2d 346, 359 (1972) (Douglas, J., concurring).

3. *Id.* at 309–310, 92 S.Ct. at 2762–2763, 33 L.Ed.2d at 390 (Stewart, J., concurring).

4. *Id.* at 312, 92 S.Ct. at 2764, 33 L.Ed.2d at 391 (White, J., concurring).

Chief Justice Burger and Justices Blackmun, Powell, and Rehnquist dissented.

As a result of *Furman* and numerous allied cases decided the same day, the Supreme Court effectively invalidated capital punishment procedures contained in laws passed by Congress, 39 states, and the District of Columbia;[5] as a practical matter, *Furman* had eviscerated the death penalty provisions of every pending Federal and state death sentence in the United States.[6]

### The Aftermath of Furman

At least 35 state legislatures, without seriously disputing *Furman,* revised their death penalty statutes to preserve capital punishment and yet overcome the procedural deficiencies noted in that decision.[7] Some adopted mandatory death penalty

provisions; others provided detailed "guided discretion" statutes with aggravating and mitigating factors.[8] On 2 July 1976, the Court rendered opinions regarding five of these revised statutes.

Was the death penalty unconstitutional under all circumstances? In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Court responded to this question, the majority finding the death penalty constitutional under the Eighth Amendment—if properly administered. A plurality concluded that Georgia's new death statute overcame the objections of *Furman.*[9] The principal plurality opinion clarified that:

In summary, the concerns expressed in *Furman* that the penalty of death not be

---

**5.** *Id.* 408 U.S. at 411, 92 S.Ct. at 2815, 33 L.Ed.2d at 449 (Blackmun, J., dissenting); *id.* at 465, 92 S.Ct. at 2842, 33 L.Ed.2d at 480 (Rehnquist, J., dissenting).

**6.** On the same day that *Furman* was announced, the Supreme Court passed upon 117 other death penalty cases. *See Stewart v. Massachusetts,* 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed.2d 744 (1972) and the numerous memorandum cases accompanying *Stewart. See generally* Trogolo, *Capital Punishment Under the UCMJ After Furman,* A.F.L.Rev. 86, 91 (Winter 1974) and Dawson, *Is the Death Penalty in the Military Cruel and Unusual?* 31 Navy JAG J. 53 (Summer 1980). *Furman* abruptly changed the constitutional status of discretionary sentencing in capital cases. For the former view, now disavowed, see *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971).

**7.** *Gregg v. Georgia,* 428 U.S. 153, 179, 96 S.Ct. 2909, 2928, 49 L.Ed.2d 859, 878 (1976) (Stewart, J.). A painstaking analysis of 35 follow-on state statutes appears at Gillers, *Deciding Who Dies,* 129 U.Pa.L.Rev. 1, 101–119 (Nov. 1980).

**8.** *See* Dawson, *supra* note 6, at 64.

**9.** Georgia retained the death penalty for the crimes of premeditated murder, felony murder, rape, armed robbery, treason, aircraft hijacking, and kidnapping for ransom or where the victim is harmed. Once a defendant has been convicted of a capital offense by a judge or jury, the second stage of a bifurcated trial is held. The death sentence may be imposed by the jury for aircraft hijacking or treason, in any case. Otherwise, the jury must find, in writing, and beyond a reasonable doubt, the existence

of at least one of ten statutory aggravating circumstances before it may impose the death sentence.

In summary form, the aggravating circumstances are:
(1) the defendant's prior record of conviction for capital felony, or "substantial history of serious assaultive criminal convictions;"
(2) felony murder;
(3) knowingly created a great risk of death to persons in public by weapon or device;
(4) murder for hire;
(5) murder of judicial officer;
(6) solicitation of murder or as agent or employee;
(7) "offense horrible"—torture, depravity, or aggravated battery;
(8) murder of peace officer, corrections employee, or fireman engaged in performance of duty;
(9) defendant in custody or confinement, or escapee;
(10) murder to avoid lawful arrest.
The judge instructs the jury to consider any mitigating or aggravating circumstances and any statutory aggravating circumstances. If the death sentence is imposed by the jury, a complete record of trial and a separate report by the trial judge are forwarded on appeal. In addition to the conventional appellate process, there is an expedited direct review by the Supreme Court of Georgia and the possibility of executive clemency. *See Gregg v. Georgia,* 428 U.S. at 165–169, 96 S.Ct. at 2922–2923, 49 L.Ed.2d at 870–872; Ga.Code Ann. §§ 26–1101, 26–1902, 26–2401 (1972) and 27–2534.1 (Supp. 1975). *See generally* Richey, *Death Penalty Statutes: A Post-Gregg v. Georgia Survey and Discussion of Eighth Amendment Safeguards,* 16 Wash.L.J. 497 (1977).

imposed in an arbitrary or capricious manner can be met *by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance.* (emphasis added).

*Gregg v. Georgia,* 428 U.S. at 195, 96 S.Ct. at 2935, 49 L.Ed.2d at 887.

Two companion cases, *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), upheld the new Florida and Texas death penalty statutes, premised essentially on the reasoning of *Gregg.* In *Proffitt,* the plurality ap-

proved "an informed, focused, guided, and objective inquiry into the question of whether [the defendant] should be sentenced to death . . . ." [10]

Similarly, in *Jurek,* the plurality found that the Texas statute acceptably "guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." [11]

The Court invalidated two revised state statutes. Both North Carolina and Louisiana had responded to *Furman* by mandat-

---

10. *Proffitt v. Florida,* 428 U.S. at 259, 96 S.Ct. at 2970, 49 L.Ed.2d at 927 (1976).

Florida retained the death penalty for premeditated murder and murder in the course of arson, involuntary sexual battery, robbery, burglary, kidnapping, aircraft piracy, use of a destructive device or bomb, or the unlawful distribution of heroin. Florida also employs the bifurcated trial. After conviction of a capital offense, the jury considers whether there exists any of seven statutory mitigating factors or any of eight statutory aggravating factors.

The mitigating circumstances are:
(1) no significant prior criminal history;
(2) extreme mental or emotional disturbance at time of crime;
(3) victim a participant or gave consent;
(4) accomplice whose participation was relatively minor;
(5) extreme duress or under domination of another;
(6) impaired mental capacity;
(7) age.

The aggravating circumstances are:
(1) committed while under sentence of imprisonment:
(2) prior capital felony or violent felony;
(3) knowing creation of great risk of death to many persons;
(4) felony murder;
(5) offense committed to avoid arrest or escape custody;
(6) murder for hire;
(7) offense committed to disrupt government function or law enforcement;
(8) offense especially heinous, atrocious, or cruel.

The jury is then directed to consider whether sufficient mitigating circumstances exist to outweigh the aggravating circumstances. Based on this balancing process, the jury renders an advisory opinion by majority vote to the trial judge as to whether the sentence should be life imprisonment or death. The judge then reweighs the statutory aggravating and mitigating circumstances, and if the aggravating fac-

tors outweigh the mitigating factors in a manner "so clear and convincing that virtually no reasonable person could differ," the judge must sentence the defendant to death and make written findings to that effect. There is automatic review, including an independent review of the relevant factors by the Supreme Court of Florida.

*Id.* at 248–253, 96 S.Ct. at 2964–2966, 49 L.Ed.2d at 920–923. *See also* Fla.Stat.Ann. §§ 782.04(1)(a) and 921.141 (Supp.1976–1977).

11. *Jurek v. Texas,* 428 U.S. at 274, 96 S.Ct. at 2957, 49 L.Ed.2d at 939 (1976).

The Texas statutory scheme retains the death penalty solely for the following five categories of murder: of a police officer or fireman, for hire, of a penal institution employee, in a prison escape, and felony murder. Upon conviction, the jury considers two statutory questions: (1) whether the evidence established beyond a reasonable doubt that the murder was committed deliberately and with the reasonable expectation that the death of the victim or another would result; and (2) whether the evidence established beyond a reasonable doubt that there was a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. A third statutory question is asked, if applicable: "[I]f raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."

If the jury unanimously finds that the state has met its burden of proof as to these questions, the death penalty is adjudged. If not, a life sentence is imposed. Additionally, the statute provides for an expedited review by the Texas Court of Appeals. *Id.* at 265–268, 96 S.Ct. at 2953–2954, 49 L.Ed.2d at 934–936; *see also* Tex.Penal Code Ann. Tit. 5, § 19.03 (Vernon 1974), Tex.Code Crim.Proc., art. 37.071 (Vernon Supp.1975–1976). For a critique of *Jurek,* see Black, *Due Process for Death,* 26 Cath.U.L.Rev. 1, 3 (1976).

ing execution of any person found guilty of certain offenses. *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). In these cases, the plurality explained that neither the Louisiana nor the North Carolina statutes provided adequate standards to guide the jury in exercising its power to select those first-degree murderers who would receive the death sentence.

Later cases have refined the principles enunciated in *Furman* and the "2 July 1976 cases." In *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Ohio death penalty statute was ruled unconstitutional because it limited the range of circumstances to be considered in mitigation.[12] In *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the Court reversed, largely because there was "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not";[13] the jury had found the defendant's homicides "outrageously or wantonly vile, horrible or

inhuman" within the meaning of an aggravating circumstance in the revised Georgia capital statute. In an allied area, in *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), the Court invalidated a Georgia statute providing a discretionary capital sentence for rape of an adult woman, stating that the punishment was disproportionate to the offense.[14]

■ The initial conclusion to be drawn from *Furman* and its progeny is this: *Death penalty provisions which fail to clearly articulate restrictive guidelines to aid the exercise of sentencing discretion are constitutionally unacceptable.*[15]

### Federal and State Decisions

In the decade following *Furman,* numerous Federal and state courts have evaluated death penalty provisions.

Imposition of the death penalty under 18 U.S.C. § 1111, the unrevised federal murder statute, has been declared constitutionally improper on several occasions.[16] The lead-

---

**12.** *Lockett v. Ohio,* 438 U.S. at 608–609, 98 S.Ct. at 2966–2967, 57 L.Ed.2d at 998 (1978).

**13.** *Godfrey v. Georgia,* 446 U.S. at 433, 100 S.Ct. at 1767, 64 L.Ed.2d at 409 (1980). *See* Occhino, *Constitutional Procedure for the Imposition of the Death Penalty—Godfrey v. Georgia,* 30 DePaul L.Rev. 721 (1981).

**14.** *Coker v. Georgia,* 433 U.S. at 593, 97 S.Ct. at 2861, 53 L.Ed.2d at 989 (1977).

**15.** *See United States v. Kaiser,* 545 F.2d 467, 470 (5th Cir.1977). For excellent analysis by commentators evaluating the dominant themes underlying the Court's decisions and articulating the present state of the law, *see* Wheeler, *Toward a Theory of Limited Punishment II: The Eighth Amendment After Furman v. Georgia,* 25 Stan.L.Rev. 62 (Nov.1972); Hancock, *The Perils of Calibrating the Death Penalty Through Special Definitions of Murder,* 53 Tul. L.Rev. 828 (Apr.1979); and Mitchell and Wein, *Evolutions of the Eighth Amendment and Standards for the Imposition of the Death Penalty,* 28 DePaul L.Rev. 351 (1979).

**16.** The full text of 18 U.S.C. § 1111 reads as follows:

§ 1111. Murder.

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait,

or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto "without capital punishment", in which event he shall be sentenced to imprisonment for life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life. June 25, 1948, c. 645, 62 Stat. 756.

At times the courts have directly ruled Section 1111 unconstitutional; on other occasions the prosecution proceeded on the premise that the death penalty was unavailable. *See United States v. Dufur,* 648 F.2d 512 (9th Cir.1980); *United States v. Shepherd,* 576 F.2d 719, 729 (7th Cir.1978) *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1978); *United States v. Weddell,* 567 F.2d 767, 770 (8th Cir.1977); *United States v. Watson,* 496 F.2d 1125, 1126 and n. 3 (4th Cir.1973); *United States v.*

ing case is *United States v. Kaiser,* 545 F.2d 467 (5th Cir.1977). Judge Goldberg, joined by Justice Clark, retired Supreme Court justice sitting by designation, analyzed *Furman* and its progeny thus:

> The Court's five death penalty decisions confirmed the principle that a system of capital punishment that does not clearly define standards to guide the exercise of sentencing discretion is constitutionally intolerable. This statute fully violated that principle; the sentence of death by electrocution shall be set aside.

*United States v. Kaiser, supra,* at 470. The "unanimous post-Furman understanding of federal courts, federal prosecutors, and Congress appears to have been that the death penalty could not constitutionally be imposed under § 1111," the court com-

Woods, 484 F.2d 127, 138 (4th Cir.1973), *cert. denied,* 415 U.S. 979, 94 S.Ct. 1566, 39 L.Ed.2d 875 (1974); *United States v. Freeman,* 380 F.Supp. 1004 (D.N.D.1974); *United States v. Quinones,* 353 F.Supp. 1325 (D.P.R.1973); *see also United States v. Bohle,* 346 F.Supp. 577 (N.D.N.Y.1972) (Federal Air Piracy statute condemned due to unfettered "lottery of jury composition and the roulette of judicial selection").

17. *See* Brief of the United States Department of Justice as Amicus Curiae on behalf of the United States Army at 2, 13, *United States v. Matthews,* 13 M.J. 501 (A.C.M.R.1982), *appeal docketed,* No. 43,538 (U.S.C.M.A. May 6, 1982).

18. In response to *Furman,* at least 35 states adopted radically new and sophisticated statutory death penalty systems. The degree to which these new statutes seek to channel discretion of the sentencing authority by providing aggravating and mitigating factors is revealed in the following typical statistics:

| STATE | NUMBER OF AGGRAVATING FACTORS | NUMBER OF MITIGATING FACTORS |
|---|---|---|
| Alabama | 8 | 7 |
| Arkansas | 7 | 6 |
| California | 21 | 9 |
| Colorado | 9 | 13 |
| Connecticut | 6 | 5 |
| Georgia | 10 | None listed but unlisted circumstances may be considered |
| Illinois | 7 | 5 |
| Indiana | 9 | 6 |
| Kentucky | 7 | 8 |
| Louisiana | 9 | 7 |
| Maryland | 10 | 7 |
| Massachusetts | 12 | 5 |

mented; to argue the provision's continuing vitality "borders on the audacious." *United States v. Kaiser, supra,* at 471.

Other Federal courts have declared capital punishment under Section 1111 unconstitutional, a result in which the United States has acquiesced.[17] Similarly, the legislative history of the Anti-hijacking Act of 1974 suggests Congressional understanding that *Furman* had invalidated the death penalty for Federal crimes. *See* 1974 U.S.Code Cong. and Admin.News 3977, 3981.

For their part, state courts have carefully reviewed their new capital punishment statutes against the guidance of *Furman.* Virtually without exception, only finely-tuned post-*Furman* statutes have won judicial approval.[18]

| STATE | NUMBER OF AGGRAVATING FACTORS | NUMBER OF MITIGATING FACTORS |
|---|---|---|
| Missouri | 10 | 7 |
| Nebraska | 8 | 7 |
| Nevada | 9 | 6 |
| New Hampshire | 7 | 5 |
| New Mexico | 6 | 9 |
| North Carolina | 11 | 8 |
| Oregon | 3 | 3 |
| Pennsylvania | 10 | 7 |
| South Carolina | 7 | 9 |
| Tennessee | 11 | 8 |
| Utah | 8 | 6 |
| Virginia | 2 | 5 |
| Wyoming | 8 | 7 |

These statistics appear in Gillers, *supra,* note 7 at 102–119.

State courts have played an important role in refining the implementation of these new statutes, in a determined effort to comply with *Furman* and overcome constitutional objections. *See, e.g., State v. Shaw,* 273 S.C. 194, 255 S.E.2d 799 (1979) (upholding death penalty with bifurcated system similar to that of Georgia); *Collins v. State,* 261 Ark. 195, 548 S.W.2d 106 (1977) *cert. denied* 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 (1977) (approving constitutionality of 1973 statute with bifurcation and aggravating and mitigating factors); *Smith v. Commonwealth,* 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied,* 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979) (upholding death penalty under 1977 statute prescribing aggravating and mitigating circumstances in bifurcated system); *Jacobs v. State,* 361 So.2d 640, *cert. denied,* 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979) (new Alabama statute analogous to Florida's, with eight aggravating and seven mitigating factors, held valid).

### The Military Death Penalty

The precise impact of *Furman* on Article 118(1) of the Uniform Code of Military Justice has not been addressed directly by the Supreme Court.[19] Several justices presently sitting have commented in dicta that the Code's death provisions must fall. Thus, for example, Justice Powell's dissenting opinion in *Furman* (in which Chief Justice Burger, Justice Blackmun, and Justice Rehnquist joined) suggested that "... numerous provisions of the Criminal Code of the United States and of the Uniform Code of Military Justice also are voided."[20] Similarly, Justice Blackmun's dissenting opinion to *Furman* prophesied that "[a]lso in jeopardy, perhaps, are the death penalty provisions in various Articles of the Uniform Code of Military Justice."[21]

In *Schick v. Reed,* 419 U.S. 256, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974), the Supreme Court declined to address the constitutionality of a death sentence imposed by court-martial but commuted prior to *Furman.*[22] However, a dissent by Justice Marshall, joined by Justices Douglas and Brennan, specifically noted that a military death sen-

---

Several state courts have ruled legislative efforts to comply with *Furman* insufficient. *See, e.g., State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied,* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979) (Arizona statutory provision struck down confining defendant to limited number of specific mitigating matters); *People v. Dist. Ct. of State,* 196 Colo. 401, 586 P.2d 31 (1978) (legislature tried to conform to *Gregg* and *Proffitt* by setting forth aggravating and mitigating factors, but exclusion of other relevant factors made statute invalid); *Commonwealth v. Moody,* 476 Pa. 223, 382 A.2d 442 (1977), *cert. denied,* 438 U.S. 914, 98 S.Ct. 3143, 57 L.Ed.2d 1160 (1978) (Pennsylvania statute, revised in 1974, held unconstitutional because it limited consideration of mitigating circumstances); *Arnold v. State,* 236 Ga. 534, 224 S.E.2d 386 (1976) (Georgia statute allowing death penalty where murder is committed by person having "substantial history of serious assaultive criminal convictions" found vague and unable to withstand constitutional scrutiny); *People v. Sup. Ct. of Santa Clara County,* 31 Cal.3d 797, 183 Cal.R. 800, 647 P.2d 76 (1982) (California Penal Code provisions based on *Proffitt* defining circumstances under which death penalty can be assessed ruled unconstitutionally vague).

This last group of cases suggests that even where states have adopted standards to guide a determination of the death penalty, such standards will be carefully scrutinized by the courts and do not easily pass muster. Even in a state such as Florida, with its Supreme Court-approved statutory scheme, departures from or improper application of established standards have been rejected. *See, e.g., Proffitt v. Wainwright,* 685 F.2d 1227 (11th Cir.1982) (consideration of non-statutory factors and unconstitutional application of aggravating factors impermissible); *Henry v. Wainwright,* 661 F.2d 56 (5th Cir.1982) (consideration of non-statutory aggravating factors rejected since it broadens discretion rather than channelling it).

**19.** Article 118 reads:

Any person subject to this chapter who, without justification or excuse, unlawfully kills a human being, when he—

(1) has a premeditated design to kill;

(2) intends to kill or inflict great bodily harm;

(3) is engaged in an act which is inherently dangerous to others and evinces a wanton disregard of human life; or

(4) is engaged in the perpetration or attempted perpetration of burglary, sodomy, rape, robbery, or aggravated arson;

is guilty of murder, and shall suffer such punishment as a court-martial may direct, except that if found guilty under clause (1) or (4), he shall suffer death or imprisonment for life as a court-martial may direct.

For comments on the U.C.M.J. *vis-a-vis* the death penalty *see* Trogolo, *supra* note 6, at 91; Dawson, *supra* note 6, at 69; English, *The Constitutionality of the Court-Martial Death Sentence,* 1979 A.F.L.Rev. 552, 560 (1979); and Russelburg, *The UCMJ's Death Penalty: A Constitutional Assessment,* The Advocate, Vol. 13, No. 2 (March-April 1981) 74, 79. Trogolo, Dawson, and Russelburg conclude that the current military death penalty provision for premeditated murder cannot withstand constitutional challenge; English reasons that the military system passes constitutional muster.

**20.** *Furman v. Georgia,* 408 U.S. at 417–418, 92 S.Ct. at 2818, 33 L.Ed.2d at 452 (Powell, J., dissenting).

**21.** *Id.* at 412, 92 S.Ct. 2842, 33 L.Ed.2d 480 (Rehnquist, J., dissenting) (desertion in the face of the enemy). *See also id.* at 465, 92 S.Ct. at 2815, 33 L.Ed.2d at 449 (Blackmun, J., dissenting). A contrary view appears in *United States v. Denson,* 588 F.2d 1112, 1121 n. 9 (5th Cir. 1979) (Article 118, U.C.M.J., not affected by *Furman* ).

**22.** *Schick v. Reed,* 419 U.S. at 260, 95 S.Ct. at 382, 42 L.Ed.2d at 435.

tence would be unconstitutional, in light of *Furman.*[23]

In military practice itself, upon at least five separate occasions in the post-*Furman* era military trial judges have treated referred capital cases as non-capital.[24] This Court, in passing, commented in *United States v. DeChamplain,* 46 C.M.R. 784, 791, n. 5 (A.F.C.M.R.1972) that *Furman* "raises doubts as to the validity of imposing the death sentence under any circumstances."

However, in *United States v. Matthews,* 13 M.J. 501 (A.C.M.R.1982) and *United States v. Rojas,* 15 M.J. 902 (N.M.C.M.R. 1983) the Army and Navy-Marine Courts of Military Review upheld the constitutionality of Article 118 despite a defense attack directly predicated upon *Furman.*

### III

█ Applying *Furman v. Georgia,* we hold that the military system for imposing the death penalty under Article 118(1) is constitutionally defective.

### *The Required Standard*

We focus now upon the standard mandated by the Supreme Court. *Furman* and the "2 July 1976 cases" declare that *unguided* jury discretion in imposing the death penalty is impermissible. A sentence of death is constitutionally *sui generis,* and the sentencing procedure must reflect such uniqueness.[25]

To satisfy this requirement, the Supreme Court has mandated that juries employ specifically legislated criteria to segregate—out of the infinite variety of crimes formerly considered capital murder—those deemed peculiarly deserving of the death penalty. As Justice Stewart clarified in *Gregg v. Georgia:*

> No longer can a Georgia jury do as Furman's jury did: reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die. Instead, the jury's attention is directed to the specific circumstances of the crime . . . .[26]

The solution, Justice Stewart explained, was a carefully-drafted statute which eliminated unbridled discretion and insured "that the penalty of death not be imposed in an arbitrary or capricious manner . . . ."[27]

*Furman* and its offspring thus have revolutionized capital sentencing procedures. A radically different system now is required: The sentencing decision must be channeled by clear, objective standards as required by *Gregg;* specific and detailed guidelines must be utilized by the jury to minimize arbitrariness as required by *Proffitt;* the particularized circumstances of the individual and the offenses must be considered, as required by *Jurek;* and the sentencing decision must be rationally reviewable by an appellate court, as required by *Godfrey.*

---

23. *Id.* at 271, 95 S.Ct. at 387, 42 L.Ed.2d at 441. In the District of Columbia Federal Circuit Court below, Judge Wright commented in dicta for the 2–1 majority that if the military death sentence had arisen after *Furman,* excision of the death sentence would have been required. *Schick v. Reed,* 483 F.2d 1266 (D.C.Cir.1973).

24. *See United States v. Fountain,* 2 M.J. 1202 (N.C.M.R.1976); *United States v. Day,* 1 M.J. 1167 (C.G.C.M.R.1975); *see also United States v. Vaughn,* 48 C.M.R. 726 (A.F.C.M.R.1974) and *United States v. Collier,* 49 C.M.R. 719 (A.F.C.M.R.1975), where Air Force Military Judges Allan C. Smith and William W. Gobrecht held that *Furman* was applicable to the military and then treated these cases as non-capital. *See* Trogolo, *supra* note 6, at 95; *see also United States v. Chriss,* cited in English, *supra* note 19, at 552. For a case treated as non-capital by the

convening authority on the basis of *Furman,* see *Wood v. McLucas,* 22 U.S.C.M.A. 475, 47 C.M.R. 643 (1973).

25. *See also Rummel v. Estelle,* 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382, 389 (1980); *Gardner v. Florida,* 430 U.S. 349, 357, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393, 401 (1977). *See generally,* Trogolo, *supra* note 6, at 91; Gillers, *supra* note 7, at 33; Meagher, *Capital Punishment: A Review of Recent Supreme Court Decisions,* 52 Notre Dame Law. 261, 274 (Dec.1976).

26. *Gregg v. Georgia,* 428 U.S. at 197, 96 S.Ct. at 2936, 49 L.Ed.2d at 888.

27. *Id.* at 195, 96 S.Ct. at 2935, 49 L.Ed.2d at 887 (1976). *See also Lockett v. Ohio,* 438 U.S. at 602, 98 S.Ct. at 2963, 57 L.Ed.2d at 985.

The "2 July 1976 cases" exemplify three systems satisfying this standard: The Supreme Court found that Georgia, Florida, and Texas each had successfully tempered the discretion of their juries by rational statutory guidelines. Contrariwise, the Court rejected the Louisiana and North Carolina mandatory death statutes; the Ohio mandatory system fell two years later.

The Supreme Court clarified in *Gregg* that other arrangements also might pass muster, for "each distinct system must be examined on an individual basis." [28] Cognizant of this fact, we canvass the three Supreme Court-approved systems for a sampling of statutes illustrating how *Furman* objections can be translated into a constitutional death sentence.

Georgia's bifurcated system requires the sentencing authority to find, beyond reasonable doubt, the existence of one or more of ten specific, statutorily-defined aggravating circumstances. The jury must specify the particular aggravating circumstance(s) in writing. The jury's attention must properly focus on the nature of the particular crime and the specific characteristics of the defendant. The jury is not compelled to sentence the defendant to death under any circumstances. A separate report by the trial judge is forwarded on appeal. Since the sentencing authority's discretion is effectively guided, the specter of imposing the death penalty in an arbitrary and capricious manner is eliminated. *Gregg v. Georgia,* 428 U.S. at 189, 96 S.Ct. at 2932, 49 L.Ed.2d at 883.

Florida's bifurcated procedure requires the jury to find one or more of eight statutory aggravating circumstances and to weigh them against any mitigating factors—including seven mitigating circumstances set out by statute. Based on these factors, the jury considers whether sufficient mitigating circumstances exist to outweigh the aggravating circumstances. The judge then receives the jury's recommendation and himself weighs the statutory circumstances and determines the sentence. A judge imposing the death penalty must set forth in writing the statutory aggravation found sufficient and also rule that the mitigation is insufficient to outweigh such judgment. *Proffitt* found that the Florida statute:

> ... passes constitutional muster. That legislation provides that after a person is convicted of first-degree murder, there shall be an informed, focused, guided, and objective inquiry into the question whether he should be sentenced to death. [29]

Texas has narrowed the categories of murder for which the death penalty is authorized. Capital murder can occur under five specific circumstances; [30] any murder of lesser culpability is excluded from capital sentencing consideration. A separate proceeding is held in which the jury must respond to two (sometimes three) specific questions, the responses to which determine the sentence. If the jury unanimously finds that the state has met its burden on all of these questions, the death penalty is adjudged; if not, a life sentence results. Furthermore, the defendant, by Texas Court of Criminal Appeals practice, may bring mitigating factors to the jury's attention. *Jurek v. Texas,* 428 U.S. at 276, 96 S.Ct. at 2958, 49 L.Ed.2d at 941. Jury assessment must set forth the reasons why a death sentence should or should not be imposed.

What lessons can be garnered from these cases? The procedures endorsed in *Gregg-Proffitt-Jurek* all contain the following common factors:

(1) a bifurcated procedure is employed with evidence relevant to the death penalty developed at the separate sentencing proceeding;

(2) sentencing discretion must be channelled by factors established by statute—either an extremely narrow

---

**28.** *Gregg v. Georgia,* 428 U.S. at 195, 96 S.Ct. at 2935, 49 L.Ed.2d at 887.

**29.** *Proffitt v. Florida,* 428 U.S. at 259, 96 S.Ct. at 2970, 49 L.Ed.2d at 927.

**30.** See note 11, *supra.* The Texas statute may set the constitutional minimum for an acceptable death penalty. *See* Mitchell and Wein, *supra* note 15, at 368.

range of specific capital offenses (Texas) or an exposition of specific aggravating factors (Georgia/Florida) which, if present, tend to increase the severity of the offense;

(3) the sentencing authority must find the existence of at least one such qualifying factor in addition to finding the elements of murder, statutorily provided;

(4) specific findings must be made regarding the qualifying factor;

(5) the opportunity to present mitigation must be virtually unrestricted, whether statutorily specified or not; and

(6) a capital sentence must be meaningfully reviewed by the state's highest court.

A later case, *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), further defines the required standard for a constitutional death penalty. In *Godfrey,* the defendant killed both his wife and mother-in-law with a shotgun. He was sentenced to death on the basis of a facially obscure provision—murder which was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim." *Godfrey v. Georgia,* 446 U.S. at 422, 100 S.Ct. at 1762, 64 L.Ed.2d at 402. The Court held that since the jury had received no instruction or explanation as to the meaning of such an inherently ambiguous provision of the sentencing statute, the sentence of death must be overturned.[31] Although *Godfrey* addresses the responsibility of appellate courts to independently review death sentences, it also clearly condemns the acceptance of wide-open terminology sufficiently broad to cover any murder.

### The Military System

Given our analysis of *Furman,* the "2 July 1976 cases," and *Godfrey,* we hold that the Supreme Court's mandated sophisticated requirements for imposing the death penalty are not met by the unrevised procedures of Article 118(1) of the Code.[32]

Measured by *Furman* and its progeny, Article 118(1) fails. It permits the jury unlimited and undirected discretion, lacking either a narrow range of specific capital offenses (Texas) or specific aggravating factors (Florida and Georgia) for imposition of capital punishment. Under the military system there are no mandatory factors to be found; no required weighing of aggravating versus mitigating factors; no insistence that the members make specific findings or answer specific questions. In sum, no specific consideration needs be given the death penalty as a unique sentence, over and above the usual, so as to avoid arbitrariness. Instead, absolute discretion is permitted the sentencing authority, unchecked by articulated standards. In contrast to *Furman et al.,* a convicted murderer is sentenced to death or life imprisonment in military jurisprudence simply "as a court-martial may direct." Article 118, U.C.M.J.

*United States v. Matthews,* 13 M.J. 501 (A.C.M.R.1982), addresses this precise issue. In lucid, thoughtful majority and minority opinions, the Army court, voting 8–4, found that: (a) court-martial procedures for imposing a death sentence for premeditated

---

**31.** *Godfrey v. Georgia,* 446 U.S. at 433, 100 S.Ct. at 1767, 64 L.Ed.2d at 409 (1980). See Mitchell and Wein, *supra* note 15, at 731–38; Occhino, *supra* note 13, at 721, 730–38.

**32.** When the U.C.M.J. was passed in 1951, the judiciary was concurrently expressing its faith in the capabilities and responsibilities of a *discretionary* sentencing system. This philosophy may well have been at its zenith when Justice Harlan wrote in *McGautha v. California,* 402 U.S. at 208, 91 S.Ct. at 1467, 28 L.Ed.2d at 726 (1971), with the concurrences of Justices White and Stewart:

> In light of history, experience and the present limitations of human knowledge, we find it quite impossible to say that committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is offensive to the Constitution. The states are entitled to assume that jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision . . . .

A year later, in a dramatic disavowal of *McGautha,* the *Furman* decision was announced.

murder were constitutional; and (b) the members' sentencing decision was properly focused and guided under *Furman* and its progeny.

The majority reasoned that *premeditation* was the acceptable military statutory aggravating factor; and that the progressive military presentencing procedure was "sufficiently focused and guided to pass constitutional muster." In particular, the Army court noted that court-martial members are entitled to consider the facts and circumstances of the offense as aggravating factors and that the accused enjoys broad latitude in submitting mitigating evidence. *United States v. Matthews, supra,* at 526–527. Since "premeditation" appears so crucial, we turn to an analysis of that term.

### Premeditation

Article 118(1) covers a broad range of murders, committed under all conceivable circumstances, encompassing "any person . . . who, without justification or excuse,

unlawfully kills a human being, when he . . . has a premeditated design to kill. . . ."

We find it most significant that Article 118(1) parallels numerous statutes struck down in *Furman* and its companions. A review of these *Furman* follow-on cases clearly reveals decisions "on all fours" with the present case, involving convictions for premeditated murder, followed by a jury determination on the issue of death versus life. The array of deliberate and premeditated murders there depicted reveals crimes of such a heinous, atrocious nature as to defy the imagination. Yet the Supreme Court—finding inadequate standards—vacated the death sentences and spared the lives of these unworthy individuals. The crucial point is this: *Over and over again in the trailer cases, decided the same day as Furman, premeditation statutes much akin to Article 118(1) failed to win Supreme Court approval.* Accordingly, on the basis of such precedent, we must disagree with the *Matthews* rationale that premeditation can serve as a satisfactory narrowing factor.[33]

---

**33.** *Stewart v. Massachusetts,* 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed.2d 744 (1972).

We synthesize the *Furman* companion cases in three ways. First, we note cases where the defendant clearly was found guilty under a premeditated murder statute and the sentence was overturned by the *Furman* trailer cases. Second, we list capital sentencing cases where premeditation appears to be crucial but the court does not *specifically* address premeditation. Third, approaching the subject from a slightly different perspective, we surface specific statutes overturned by *Furman* and compare those statutes to Article 118(1).

First, the following premeditation cases, decided the same day as *Furman,* fall within the initial category:

Connecticut—*Davis v. State,* 158 Conn. 341, 260 A.2d 587 (1969) (six counts of first degree murder with a carbine, trial by three judges, defendant "going to hurt someone tonight").

Delaware—*Steigler v. State,* 277 A.2d 662 (1971) (first degree murder, three charges, arson). *Seeney v. State,* 277 A.2d 670 (1971) (first degree murder, defendant shot fiancee).

Florida—*Brown v. State,* 245 So.2d 68 (1971) (first degree murder; robbery at motel).

Georgia—*Lee v. State,* 226 Ga. 162, 173 S.E.2d 209 (1970) (defendant shot victim in his apartment; admitted to earlier burglaries of the apartment).

Kentucky—*Williams v. Commonwealth,* 464 S.W.2d 244 (1971) (deliberate murder of wife's ex-husband in her presence for $1,000.00).

Massachusetts—*Commonwealth v. French,* 357 Mass. 356, 259 N.E.2d 195 (1970) (conspiracy to murder, six defendants).

North Carolina—*State v. Hamby,* 276 N.C. 674, 174 S.E.2d 385 (1970) (heinous murder of 74-year old man).

Pennsylvania—*United States ex rel. Phelan v. Brierley,* 427 Pa. 265, 234 A.2d 540 (1967), 453 F.2d 73 (1971) (defendant confessed to planned double murder).

Texas—*Thames v. State,* 453 S.W.2d 495 (Tex.Cr.App.1970) (murder of operator of night club).

Virginia—*Brown v. Commonwealth,* 212 Va. 515, 184 S.E.2d 786 (1971) (atrocious murder of four-year old).

Washington—*State v. Tyler,* 77 Wash.2d 726, 466 P.2d 120 (1970) (defendant deliberately shot women in elevator).

Second, we consider the *Furman* companion cases in which premeditation is indicated from the factual circumstances presented but the reviewing court does not *specifically* address premeditation. This category includes: *Hubbard v. State,* 283 Ala. 183, 215 So.2d 261 (1968) (strangulation—murder of woman); *Thacker v. State,* 226 Ga. 170, 173 S.E.2d 186 (1970) (defendant deliberately shot detective

A comparison of Article 118(1) to the 35 finely-honed, sophisticated state statutes re-enacted since *Furman* also clearly illus-trates how far the military system falls short. It provides voting members no guid-ance as to the circumstances under which premeditated murder warrants death and when it merits life imprisonment. In sum, nowhere in Article 118(1) can be found ex-plicit aggravating or mitigating factors or delimiting definitions to narrow the class of those who will die.

"Premeditation" cannot fill that void since it is an element of each and every Article 118(1) crime; therefore, premedita-tion provides no handholds for the crucial jury question of distinguishing which ac-cused deserves capital punishment.[34] In short, "premeditation" falls fatally short as the explicit aggravating predicate enabling jurors to avoid *arbitrariness* as they decide the life-or-death issue.[35] To the contrary,

---

arresting him); *Bartholomey v. State,* 260 Md. 504, 273 A.2d 164 (1971) (escapee murdered two police officers); *Koonce v. State,* 456 P.2d 549 (Okl.Cr.1969) (heinous murder in Oklaho-ma of two women; apparent rape); *State v. Atkinson,* 253 S.C. 531, 172 S.E.2d 111 (1970) (defendant shot officer in head from rear seat of patrol car); *McKenzie v. State,* 450 S.W.2d 341 (1970) (arson; defendant murdered eight people).

Third, we inspect several state statutes void-ed by *Furman et al.* which prove remarkably similar to Article 118(1) of the Code. Thus, e.g., in § 53–10 of the Connecticut General Statutes, the legislature had provided that on conviction for murder in the first degree "the determination of the penalty of life imprison-ment or death shall be in the discretion of the court or jury trying the issue of fact on the evidence presented." Pursuant to this statute the Connecticut Supreme Court in *State v. Del-gado,* 161 Conn. 536, 290 A.2d 338 (1971) af-firmed a conviction and death sentence for the exceptionally heinous murder of a police offi-cer. Despite Connecticut's bifurcated proce-dure, the U.S. Supreme Court vacated the death penalty in a trailer case to *Furman. Del-gado v. Connecticut,* 408 U.S. 940, 92 S.Ct. 2879, 33 L.Ed.2d 764 (1972). For examples of other discretionary state statutes invalidated by the *Furman* trailer cases providing for death or life imprisonment to be determined by the sentencing authority—as does Article 118(1)—see Okla.Stat.Ann. Tit. 21 § 1707 (West 1971), overruled in *Fesmire v. Oklahoma,* 408 U.S. 935, 92 S.Ct. 2855, 33 L.Ed.2d 749 (1972); Miss. Code Ann. § 97–3–21 (1972), overruled in *Irv-ing v. State,* 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972); N.C.Gen.Stat. § 14–17 (1949), overruled in *Miller v. North Carolina,* 408 U.S. 937, 92 S.Ct. 2863, 33 L.Ed.2d 755 (1972).

We note that in the 1972 decisions, the Su-preme Court failed to discover one satisfactory statutory scheme for imposition of the death penalty. *See Furman v. Georgia,* 408 U.S. 845 at 934–942, 92 S.Ct. 2726 at 2845–2879, 33 L.Ed.2d 346 at 745–765. Yet in these cases, "premeditation statutes" accounted for 61 death sentences in 19 states. *United States v. Matthews, supra,* at n. 22 (Jones, S.J., dissent-ing). Therefore after analysis of these cases and statutes, we believe precedent fails to sup-port the rationale of the *Matthews* majority that premeditation can serve as a satisfactory narrowing factor to avoid arbitrariness in as-sessing the death penalty.

**34.** MCM, 1969 (Rev.) para. 197*b* provides:

> b. *Premeditation.* A murder is not premedi-tated unless the thought of taking life was consciously conceived and the act or omis-sion by which it was taken was intended. Premeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act intend-ed. It is not necessary that the intention to kill shall have been entertained for any par-ticular or considerable length of time. When a fixed purpose to kill has been deliberately formed, it is immaterial how soon afterwards it is put into execution. The existence of premeditation may be inferred from the cir-cumstances surrounding the killing.

*See also* Dawson, *supra* note 6, at 70. In the instant case, the defense attempt to introduce specific mitigating factors was rejected by the military judge.

**35.** Arbitrariness has been condemned in the selective enforcement of the death penalty. *See Furman v. Georgia,* 408 U.S. 238, 245, 251–252, 92 S.Ct. 2726, 2786, 33 L.Ed.2d 346, 356–357 (1972) (Douglas, J., concurring); *see* Mitch-ell and Wein, *supra,* note 15 at 383; Wheeler, *supra,* note 15 at 80–83.

The accused in this case is black. In view of our disposition today, we do not reach the question of racially discriminatory application of the military death penalty. For a provoca-tive argument as to the disproportionate im-pact of the death sentence on black military personnel under the U.C.M.J., see Brief of the N.A.A.C.P. Legal Defense and Educational Fund, Inc., *et al.,* as Amicus Curiae on behalf of the United States Army at 28, *United States v. Matthews,* 13 M.J. 501 (A.C.M.R.1982) *appeal docketed* No. 43,538 (U.S.C.M.A., 6 May 1982) ("of the 12 servicemen executed since 1950, at least 8, and perhaps as many as all 12, were black.")

this shapeless concept fails to rivet the sentencing decision in an objective, rational manner.[36]

Arguably, the state statute most similar to Article 118(1) is that of Texas, since it lacks specific aggravating or mitigating considerations. Close examination shows crucial differences between the Texas and military provisions. First, as the Supreme Court found in *Jurek,* Texas has severely narrowed the range of capital crimes to one—murder with malice aforethought in five specific situations: (a) murder of a police officer or fireman; (b) murder for hire; (c) murder of a penal institution employee; (d) murder in a prison escape; and (e) certain felony murders. Second, Texas requires a sentencing decision upon three statutory questions (deliberateness of the crime; the offender's continuing threat to society; and any provocation for the killing) which serve to properly focus the minds of the jurors away from discretionary considerations. Furthermore, mitigating factors, under Texas procedure, may be advanced by the defendant even though the statute is silent on the matter. The important point to be made is this: Though the Texas statute contains no aggravating or mitigating factors, the legislature has nevertheless attenuated severely the class

---

Over and above the problem of racially discriminatory application is the more general problem of whether only the most vile military murderers receive the death penalty. It has been argued that if the U.C.M.J. escapes the defects inherent in pre-*Furman* statutes, statistics pertaining to implementation of military death penalties will disclose consistent, even-handed application. For a critical view that there is no such consistency, see Russelburg, *supra* note 19, at 81–83 and Dawson, *supra* note 6, at 54 and 57.

**36.** It is important to understand how far short the present Article 118(1) falls from the standards required by *Furman.* See the cases gathered at note 18, *supra.* The point might best be illustrated by comparing the present article with a proposed Article 118 purportedly meeting *Furman* standards. Dawson, *supra,* offers the following proposal:

10 U.S.C. § 918 might be amended to add the following: (5) If a guilty finding under clause (1) is entered, the determination whether sentence of death shall be imposed shall be in the discretion of the members. In exercising such discretion, the members shall take into account the aggravating and mitigating circumstances herein enumerated and any other facts deemed relevant but shall not impose sentence of death unless they find unanimously and beyond a reasonable doubt, in writing, the existence of at least one of the aggravating circumstances enumerated herein.
A. *Aggravating Circumstances*
(i) The murder was committed by a service member actually serving a sentence to confinement at hard labor awarded by a general court-martial or a special court-martial.
(ii) The defendant was previously convicted of an offense punishable by imprisonment for five or more years pursuant to the Table of Maximum Punishments, *Manual for Courts-Martial,* 1969 (Rev.).
(iii) At the time the murder was committed the defendant also caused the death of another person.
(iv) The defendant knowingly created a great risk of death to many persons.
(v) The murder was of another person subject to this Chapter, in time of war.
(vi) The murder was committed for pecuniary gain.
(vii) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity.
B. *Mitigating Circumstances*
(i) The defendant has no significant history of prior criminal activity.
(ii) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.
(iii) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.
(iv) The murder was committed under circumstances which the defendant believed to provide a moral justification or extenuation for his conduct.
(v) The defendant is a principal under Article 77, Uniform Code of Military Justice, in a murder committed by another person and his participation in the homicidal act was relatively minor.
(vi) The defendant acted under duress or under the domination of another person.
(vii) At the time of the murder, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication.
Another suggestion is contained in the proposed Rule 1004 of the new draft Manual for Courts-Martial.
We neither endorse nor disapprove these proposals, but advance them to show how radical the required surgery might be to square the current version with *Furman* standards.

of capital offenders eligible for the death penalty.

Differences between the Court-approved Texas statute and Article 118(1) are startling. They refute any viable argument that "premeditation" is sufficient to save Article 118(1) as its aggravating factor. In Texas, "malice aforethought" defines a category of killings—a definition generally equivalent to Article 118's "premeditation." But defining the word is only one-fourth of the Texas response. The five narrow categories of capital murder, the mitigating matters permitted by state practice, and the three statutory questions become a trinity of additional factors dramatically shrinking the numbers facing capital punishment.

The gut issue behind *Furman*—arbitrariness in the administration of capital punishment—is thus tempered and channeled in Texas; nothing within Article 118(1)'s treatment of the term "premeditation" assuages this concern. In military courts, it is as if *Furman et al.* never had been announced. Clearly, then, the Texas statute is inapposite to Article 118(1).[37]

### Unanimity

If premeditation is the determinant of life or death, we also discern a fatal voting problem concerning unanimity.

Initially, only two-thirds of the members need concur in findings of guilty. There is no *guarantee* of unanimity at this stage since no procedure exists to discover if any member voted for a finding other than premeditated murder. M.C.M., 1969 (Rev.), para. 74*d* (3).

Later, however, it becomes the duty of each member to vote for a proper sentence for premeditated murder; this is so, regardless of his or her possible earlier vote on findings that the accused is either innocent or guilty of some lesser offense not requiring the forced choice of death or life imprisonment. See M.C.M., para. 76*b* (2) and (3) and Article 118, U.C.M.J. At this point, a death penalty sentence must be unanimous. A "hold out" member who voted during findings for other than premeditated murder is compelled to vote the appropriate sentence for a premeditated murderer—without regard to his or her earlier opinion that the accused is not guilty of that specific crime.

It follows that—even assuming that premeditation somehow becomes the military statutory aggravating/narrowing factor—*there is no guarantee that the members found premeditation unanimously.*

### Sentencing Instructions

In this case, the members received no instruction or explanation as to the *significance* of the term "premeditation" in sentencing.

The members likely would be nonplussed to learn that premeditation was pivotal in their imposing the death penalty; to the contrary, the record reveals no communication expressed to them of any realistic, direct nexus between premeditation and their unanimous finding of the ultimate penalty.

In regard to sentencing we find that neither the Code nor Manual for Courts-Mar-

---

37. See *Jurek v. Texas,* 428 U.S. at 270–272, 96 S.Ct. at 2950, 49 L.Ed.2d at 937–38. *See also* English, *supra* note 19, at 567.

One writer has commented that the Texas statute is paralleled in four other states:

Texas is the only state with a bifurcated sentencing procedure which requires the jury to consider three questions of a general nature concerning the offender and his crime. However, the Texas "laundry list" murder statute is similar to death penalty statutes of four other states [Connecticut, Arkansas, Ohio, and Utah.] Three of these states require, in addition to consideration of the "laundry list," a consideration of aggravating circumstances in the sentencing stage of the

trial. Consequently, in order to impose a death sentence these statutes require either a premeditated murder or a murder occurring under an aggravating circumstance. *A second aggravating circumstance must then be found during the sentencing stage of the trial which must outweigh any mitigating circumstances considered at that time.* [Ohio] requires an indictment to be returned specifying both a murder conviction and an aggravating circumstance. If this is returned, the sentencing authority must then consider mitigating circumstances ... these statutes should meet Court approval (footnotes omitted; emphasis added)

Richey, *supra* note 9, at 505–506.

tial provides adequate standards for how the voting members should exercise their discretion in a capital case. *See* M.C.M., paras. 75, 76. No standards or factors appear in these sources or in the military judge's sentencing instructions in this case. The court members were left, at this stage, in a position similar to that of the jurors in *Furman;* they were merely told to punish the accused "as a court-martial may direct." The uninhibited standard instructions employed in this case are no substitute for meaningful standards.

### Bifurcation; appellate review; a protective system

Neither bifurcation nor meaningful tiered appellate review—both clearly present in military practice—can save an otherwise inadequate statute.[38] The claim of mandatory, meaningful review is quixotic at best absent some objective standard which an appellate court conscientiously can review to ascertain if the results were capricious or unsound. In military practice, there is no way to tell. It is significant to note, once again, that some of the companion cases overturned on the same day as *Furman* boasted such progressive features, but they did not survive scrutiny.[39]

Nor can it be said that Article 118(1) is saved simply because the military justice system is enlightened and protective of individual rights. Substantial protections are enjoyed by those tried under Federal murder statutes as well—including some benefits not present in the U.C.M.J. These include 20 peremptory challenges; two statutorily-appointed attorneys; a 12-member jury and a requirement for unanimous findings.[40] Yet despite such enlightened procedures, the Federal murder statute has been

consistently declared unconstitutional in application *vis-a-vis* the death penalty.[41]

### Conclusion

It is important to spell out what this case is *not* about. We do not express today our personal views on capital punishment. Neither do we rule on the constitutionality of the military death penalty in combat or wartime situations. Nor do we opine whether this accused should have received the death penalty under a properly-drawn statute. We do not enter the quicksands of legal philosophy to analyze whether *Furman et al.* were wisely decided. Finally, we do not address whether the forum for change must be Congress, rather than the Executive or even the Judicial branch, with a *Furman*-type instruction composed by the military judge and placed before a military jury without an amendment to Article 118(1).

Our obligation, rather, is to measure the Code's premeditated murder provision, given the yardstick of Supreme Court precedent. Doing so, our analysis leads to an inexorable conclusion: Any death penalty statute failing to channel the discretion of the determining authority—whether judge or jury—will not meet the constitutional safeguards established by the Supreme Court.

Article 118(1) cannot stand alone as an exception to such principle. Its constitutionality must be weighed in the same manner as state and Federal death penalty statutes. Given Supreme Court precedent, it is apparent that Article 118(1), which authorizes a court-martial to mete out the death penalty simply upon a showing of premeditation, fails to provide objective standards to channel the discretion of the court-martial.[42]

---

**38.** See *Godfrey v. Georgia,* 446 U.S. at 426 and 429, 100 S.Ct. at 1763 and 1765, 64 L.Ed.2d at 405 and 407; see *Richey, supra* note 9, at 507 n. 78.

**39.** See note 33, *supra.*

**40.** See Fed.R.Crim.P. 24(b) (peremptory challenges); 18 U.S.C. § 3005 (two attorneys to defend capital cases); Fed.R.Crim.P. 23(b)

(twelve-member jury); and Fed.R.Crim.P. 31(a) (unanimity of verdict).

**41.** See notes 15 and 16, *supra.*

**42.** Members of a military jury are generally knowledgeable in matters of command. However, does this mean such members are so automatically free of impulse and emotion so as to be immunized from the arbitrariness

Article 118(1) is a constitutionally-deficient anachronism, typical of "murder one" statutes existing in many states prior to *Furman.* In the post-*Furman* era, however, it is a fatally flawed throwback.

This deficiency, in our view, cannot be cured by standard instructions on sentencing given to the court; nor can it be avoided by the fact that sentencing is undertaken in a separate bifurcated proceeding where free play is permitted both aggravating and mitigating evidence. In the absence of standards to prevent arbitrariness, there remains no assurance that the untrammeled determination to take the life of an accused is not arbitrary or capricious.

To summarize: *Furman* and its follow-on cases are a major departure from earlier precedent; they have fundamentally changed the law of the land. Now that the Supreme Court has spoken, Article 118(1) cannot stand as an exception to that teaching. Military jurisprudence must conform to *Furman* and its progeny; we are persuaded that it does not. Accordingly, we will not approve that portion of the accused's sentence extending to death; we will approve a sentence of life imprisonment, dishonorable discharge, and accessory penalties.

## IV

█ The accused contends that the military judge erred as to the charge of unpremeditated murder of Airman Lamberty by instructing the court that:

In the absence of evidence to the contrary, it may justifiably be inferred that a person intends the natural and probable consequence of an act purposely done by him. Thus, if a person does an intentional act likely to result in death or great bodily harm, *you may infer that he intended to inflict death or great bodily harm.* (emphasis added)

To support this thesis, the accused relies principally on *Mann v. United States,* 319

F.2d 404 (5th Cir.1963) *cert. denied,* 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964); there, the court rejected a similar instruction. The heart of the accused's position is this: If an "inference" from a set of facts must be overcome with opposing evidence, that "inference" is in reality converted to a presumption; in turn, this impermissibly shifts the burden of proof to the accused. *See also Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

*Mann v. United States, supra,* contains a jury charge similar to that in the instant case which is quoted above. However, *Mann* has been often distinguished, limited, and criticized. *See, e.g., United States v. McCollom,* 664 F.2d 56 (5th Cir.1981); *United States v. Apfelbaum,* 621 F.2d 62 (3rd Cir.1980); *United States v. Haldeman,* 559 F.2d 31, 116 (D.C.Cir.1976); *United States v. Chiantese,* 560 F.2d 1244 (5th Cir.1977), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979) (extensive history of *Mann,* "one of the most discussed . . . cases in our circuit."); *Helms v. United States,* 340 F.2d 15, 18 (5th Cir.1964).

We do not agree that the inference was improperly converted to a presumption or that the burden of proof was impermissibly shifted to the accused on the issue of intent. *United States v. Miller,* 8 U.S.C.M.A. 33, 23 C.M.R. 257 (1957) appears dispositive of the matter. *See also United States v. Cuffee,* 10 M.J. 381 (C.M.A.1981) (distinguishing shifting burden of production from burden of persuasion) and *United States v. Speer,* 2 M.J. 1244 (A.F.C.M.R.1976) ("In our jurisprudence . . . the trial judge, in his discretion, may instruct the court members on recognized justifiable inferences which may be drawn from the evidence.").

Furthermore, the military judge's instructions must be weighed as a whole to determine if reversal is required. In this case, the record contains numerous addi-

against which *Furman* militates? *See generally* Occhino, *supra* note 13, at 727.

The claim that pretrial protections in the military surpass civilian counterparts is particular-

ly diminished in this case; the convening authority referred the case as capital despite the recommendation of his staff judge advocate.

tional instructions which clearly advised the court, *inter alia,* that the Government has the burden of proving the accused's guilt beyond a reasonable doubt; that this burden never shifts throughout the trial; and that the law imposes no duty upon an accused to produce any evidence. Viewing the instructions in their overall context, we are satisfied that the members were not misled by the challenged instruction. *Capp v. Naughten,* 414 U.S. 141, 146–146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368, 373 (1973); *United States v. Duke,* 527 F.2d 386 (5th Cir.1976); *Guichard v. Smith,* 471 F.Supp. 784, 790–791 (E.D.N.Y.1979).

## V

■ We are invited to consider whether the pretrial advice to the convening authority induced in him a disqualifying personal interest in the outcome of the case. Premised upon *United States v. Crossley,* 10 M.J. 376, 378 (C.M.A.1981), the defense asserted at trial that the pretrial advice was misleading and insufficient because the convenor's "focus was drawn away from the question of ... referring this case as capital or non-capital." The specific flaw advanced by the defense is a passage in the advice counselling the convening authority to decide *now* whether he could ultimately approve capital punishment, should it be adjudged; [43] to the defense, this invited the convenor to "state a personal interest" in the outcome. The military judge denied the motion.

We have reviewed the extremely able pretrial advice; we find that it presented a thorough, balanced discussion on the question of capital punishment—both as it relat-

ed to this case and to the general status of the death penalty since *Furman.*

Far from attempting to fan the convening authority's personal interest in a pro-capital punishment direction, the advice actually recommended *against* referring the case as capital. Furthermore, in our view the specific language in question did not commit the convening authority in advance to ultimately approving a death sentence; it simply sought to confront him with the gravity of his pretrial determination.

*United States v. Crossley, supra,* is plainly inapposite. *Crossley* involves a convening authority who was present at an event while the misconduct charged took place. It offers no support to this assignment of error. We conclude that the military judge did not err in denying trial defense counsel's motion.

## VI

■ The accused claims error in the alleged failure of the convening authority to grant a defense post-trial motion for a new psychiatric examination pursuant to M.C.M., para. 124. The thrust of this contention is not that the convenor failed to authorize a post-trial psychiatric examination—which was done—but that he "erred in not submitting the entire question of the accused's sanity for a complete re-evaluation." We find this assignment without merit.

The defense motion was based on an examination of the accused performed by a New Mexico state forensic evaluation team. Earlier, the accused had been evaluated by

---

**43.** The paragraph reads as follows:

The decision to refer Specification 1 of Charge II to trial as capital or non-capital rests solely with you as the general court-martial convening authority. Aside from this pretrial advice, neither the Uniform Code of Military Justice, Manual for Courts-Martial, nor case law provides you with any guidance upon which to base your decision. I believe the decision must be premised upon fairness and due process for both the accused and our society. In the final analysis, *I feel you must ask yourself if you are willing to approve a capital sentence in this case (should one be*

*adjudged by the court-martial) and forward it to the President of the United States for his ultimate decision.* I also believe the procedural safeguards, which must be followed in capital cases, would overly complicate the proceedings, prolong the court-martial, and increase the potential for reversible error. Aside from the serious constitutional issues surrounding the military death penalty, I believe the facts and circumstances of this case would not unanimously convince a court-martial, or eventually the President, of the propriety of the death sentence in this case. (emphasis added).

an Air Force sanity board, which found him legally responsible and competent to stand trial. Because the New Mexico state board provided only tentative findings, the convening authority directed a post-trial psychiatric examination by Doctor James Corcoran, an eminent forensic psychiatrist specifically requested by the accused. Doctor Corcoran had retired from active military duty but his services were obtained under a special consultation contract.

The convenor requested that Doctor Corcoran "identify and discuss any mental disorders currently present in Airman Gay." A letter to Doctor Corcoran from the deputy chief of military justice further instructed him not to redo what the pre-trial sanity board had already done; however, Doctor Corcoran was advised to notify the deputy chief of military justice immediately if the doctor believed it necessary to further explore the issues of criminal responsibility or competency. If he found no basis for such exploration, he was to provide his rationale therefor.

Doctor Corcoran conducted an extensive in-patient psychiatric evaluation of the accused at Wilford Hall USAF Medical Center which extended over two days. It included a neurological examination, a sleep-deprived electroencephalogram, and an alcohol-induced encephalogram. Doctor Corcoran found no evidence of either an overt or underlying psychiatric disorder such as schizophrenic process or organic brain syndrome. Furthermore, he saw no reason that the accused's behavior stemming from chronic alcoholism should warrant the diagnosis of a personality disorder. In regard to the guidance of the deputy chief of military justice, Doctor Corcoran apparently felt that expanded inquiry was unnecessary into the matter of criminal responsibility and competency.

Based on our analysis of the circumstances presented, we hold that a re-evaluation of the accused's criminal responsibility or competence was not justified. Such matters were fully considered prior to trial, and they were not raised by the accused at trial. Nothing in the record, we believe, suggests that yet another inquiry into the accused's mental responsibility is warranted. *See United States v. Triplett,* 21 U.S.C.M.A. 497, 45 C.M.R. 271 (1972); *United States v. Wimberley,* 16 U.S.C.M.A. 3, 36 C.M.R. 159 (1966).

## VII

The accused argues that the convening authority erred in this death sentence case by ordering the adjudged forfeitures to apply on or after the date of his action. In *United States v. Matthews, supra,* at 533–534, the majority reasoned that: (1) a death sentence imposed by court-martial does *not* automatically include confinement; and (2) criminal statutes must be strictly construed. Thus, confinement of the accused was seen as a necessary incident to the death sentence while the accused awaited execution—but confinement was not inevitably a part of the sentence. Accordingly, the *Matthews* majority could find no authority to apply forfeitures as of the date of the convenor's action.

We disagree. Confinement for life is an inherent part of a sentence to death, in our judgment. To hold otherwise would be to permit a convicted murderer sentenced to death to draw pay and allowances while a prisoner sentenced to confinement for the simplest of delicts would not. This we do not discern to be Congress' intent.

## VIII

The accused further claims that the evidence is insufficient to show premeditation in the murder of Sergeant Rodriguez or specific intent as to the attempted murder of Airman Brockett. We have painstakingly reviewed the record and are convinced beyond peradventure that the evidence is sufficient to sustain the findings of the court-martial as to these two matters.

We believe these issues have been resolved by the superb staff judge advocate's review in this case. In making our own independent assessment of the evidence in regard to premeditation, we find persuasive the accused's assertions that he intended to act upon the perceived wrong of the haircut

reprimand; his warning of how he would injure someone; his comments as to the violent way in which such a matter would be handled back in his home town; his statements about Sergeant Rodriguez that "I am going to get him tonight"; his forecast that the authorities would be making a mistake that night in issuing him his M-16 rifle and 120 rounds of ammunition; and his comment that "my mother gets all my stuff." We also find worthy of note the accused's extensive training with the M-16 rifle and his performance with that weapon at the time in question. We have weighed all the evidence, including that relating to voluntary intoxication. We find no error.

## IX

We have considered the other matters raised by the defense and resolve each adversely to the accused. We have also considered the Petition for New Trial under Article 73, U.C.M.J., 10 U.S.C. § 873. Since we find that the death penalty may not be imposed in this case, the factual matters alleged in the Petition for New Trial are mooted. Accordingly, the Petition for New Trial is denied.

## X

The findings of guilty are approved. Only so much of the sentence as extends to life imprisonment, dishonorable discharge, forfeiture of all pay and allowances and reduction to airman basic is approved. The findings of guilty and the sentence, as modified, are

## AFFIRMED

HEMINGWAY, Senior Judge, and CANELLOS, RAICHLE and SNYDER, Judges, concur.

HODGSON, Chief Judge (concurring):

I concur in Senior Judge Kastl's scholarly and well-reasoned opinion that Article

118(1) of the Code does not meet the constitutional standards that are required before the death penalty can be imposed. I write separately, however, to briefly state my views on the appropriateness of the death penalty for purely military offenses.

In *Parker v. Levy,* 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439, 451 (1974), Justice Rehnquist emphasized that "the military is, by necessity, a specialized society separate from civilian society" and that "military law . . . is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment." This observation was followed two years later in *Middendorf v. Henry,* 425 U.S. 25, 50, 96 S.Ct. 1281, 1295, 47 L.Ed.2d 556, 573 (1976), when Justice Powell stated that "the 'unique military exigencies' . . . necessarily govern many aspects of the military service." I am aware it is popular today to blur this dividing line, and urge that a military career is the same as employment with any large corporation with branch offices throughout the world. But this is simply not so. Service members have duties and obligations that are not visited upon those employed in the private sector. Recent history has taught us that loyalty to one's self and nation can make an intolerable captivity survivable.

There are numerous military offenses that generally have no counterpart in the civilian community. These include mutiny,[1] knowingly forcing a safeguard,[2] compelling a superior to surrender,[3] misbehavior before the enemy,[4] and spying.[5] All these, save spying,[6] are uniquely military crimes the commission of which can result in disastrous consequences for the unit involved and ultimately the country. It is the offense of spying in wartime that I use to illustrate my concern. Whether the death penalty can be invoked for military crimes occurring during wartime is an issue that has not

1. Article 94, U.C.M.J., 10 U.S.C. § 894.

2. Article 102, U.C.M.J., 10 U.S.C. § 902.

3. Article 100, U.C.M.J., 10 U.S.C. § 900.

4. Article 99, U.C.M.J., 10 U.S.C. § 899.

5. Article 106, U.C.M.J., 10 U.S.C. § 906.

6. 18 U.S.C. § 794.

yet ripened.[7] *See generally Schick v. Reed,* 419 U.S. 256, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974). However, it seems ill-advised to limit the penalty for spying to life imprisonment with parole as a possibility. This is especially so where the espionage results in the death of countless persons and affects the outcome of the war. Further, if the death penalty for the military offenses discussed above is abolished, the ability of the United States to successfully wage war will be greatly diminished when combat personnel perceive life imprisonment with the possibility of parole infinitely preferable to a hazardous mission.

MILLER, Judge, dissenting:

Simply stated, the question before us today is whether or not those procedural requirements pertaining to valid imposition of capital punishment that the Supreme Court has levied upon our nation's civilian justice system are equally applicable to our nation's military justice system. Concluding that they are not, I dissent.

I

The briefest review of Supreme Court decisions leading to these extraordinary procedural requirements unequivocally demonstrates that they stem directly from that Court's perception that the "evolving standards of decency that mark the progress of any maturing society,"[1] have so "enlightened [our civilian society's] concept of humane justice"[2] as to make the arbitrary or capricious imposition of this totally unique[3] punishment, that extinguishes the

---

7. Justice Powell's dissent in *Furman v. Georgia,* 408 U.S. 238, 417–18, 92 S.Ct. 2726, 2818, 33 L.Ed.2d 346, 452 (1972), opines that the majority opinion also voids numerous provisions of the U.C.M.J. The provisions were not identified.

1. *Gregg v. Georgia,* 428 U.S. 153, 172–173, 190, 96 S.Ct. 2909, 2925, 2933, 49 L.Ed.2d 859, 874, 884 (1976). *See id.,* at 227–231, 96 S.Ct. at 2971–2973, 49 L.Ed.2d at 904–907 (Brennan, J., dissenting); *Furman v. Georgia,* 408 U.S. 238, 241–242, 92 S.Ct. 2726, 2728, 33 L.Ed.2d 346, 351 (1972) (Douglas, J., concurring); *id.* at 269–270, 92 S.Ct. 2742, 33 L.Ed.2d at 366–367 (Brennan, J., concurring); *id.* at 329, 92 S.Ct. at 2772, 33 L.Ed.2d at 401 (Marshall, J., concurring); *id.* at 383, 388, 92 S.Ct. at 2800, 2803, 33 L.Ed.2d at 432, 435 (Burger, C.J., dissenting); *id.* at 425, 429, 92 S.Ct. at 2821–2822, 2823, 33 L.Ed.2d at 457, 459 (Powell, J., dissenting); *Woodson v. North Carolina,* 428 U.S. 280, 301, 96 S.Ct. 2978, 2989, 49 L.Ed.2d 944, 959 (1976); *id.* at 308–309, 312–313, 96 S.Ct. at 2993, 2995, 49 L.Ed.2d at 963–964, 966 (Rehnquist, J., dissenting); *Roberts v. Louisiana,* 428 U.S. 325, at 336; 96 S.Ct. 3001, at 3007, 49 L.Ed.2d 974, at 983 (1976); *Estelle v. Gamble,* 429 U.S. 97, at 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251, 259 (1976); *Ingraham v. Wright,* 430 U.S. 651, 668 n. 36, 97 S.Ct. 1401, 1411 n. 36, 51 L.Ed.2d 711, 728 n. 36 (1977); *id.* at 684 n. 1, 97 S.Ct. at 1419 n. 1, 51 L.Ed.2d at 738–739 n. 1 (White, J., dissenting); *Coker v. Georgia,* 433 U.S. 584, 603–604, 97 S.Ct. 2861, 2872, 53 L.Ed.2d 982, 996 (1977) (Powell, J., concurring in part, dissenting in part); *Carmona v. Ward,* 439 U.S. 1091, 1094–1095, 99 S.Ct. 874, 876–877, 59 L.Ed.2d 58, 59 (1979) (Marshall, J., dissenting); *Rummel v. Estelle,* 445 U.S. 263, 291–292, 100 S.Ct. 1133, 1148, 63 L.Ed.2d 382, 402 (1980)

(Stewart, J., concurring); *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59, 68 (1981); *id.* at 372, 101 S.Ct. at 2412, 69 L.Ed.2d at 85 (Marshall, J., dissenting); *Hutto v. Davis,* 454 U.S. 370, 386, 102 S.Ct. 703, 711, 70 L.Ed.2d 556, 567–68 (1982) (Brennan, J., dissenting); *Enmund v. Florida,* 458 U.S. 782, 813, 814, 817 n. 32, 822, 102 S.Ct. 3368, 3385, 3386, 3387 n. 32, 3390, 73 L.Ed.2d 1140, 1162, 1162, 1165 n. 32, 1168 (1982) (O'Connor, J., dissenting). *See also Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, 642 (1958).

2. *Gregg v. Georgia, supra,* 428 U.S. at 171, 96 S.Ct. at 2924, 49 L.Ed.2d at 873. *See Furman v. Georgia, supra,* 408 U.S. at 241–242, 92 S.Ct. at 2728, 33 L.Ed.2d at 351 (Douglas, J., concurring); *id.* at 383, 92 S.Ct. at 2800, 33 L.Ed.2d at 432 (Burger, C.J., dissenting); *id.* at 429, 92 S.Ct. at 2823–2824, 33 L.Ed.2d at 459 (Powell, J., dissenting); *Ingraham v. Wright, supra,* 430 U.S. at 668 n. 36, 97 S.Ct. at 1411 n. 36, 51 L.Ed.2d at 728 n. 36. *See also Weems v. United States,* 217 U.S. 349, 378, 30 S.Ct. 544, 553, 54 L.Ed. 793, 803 (1910); *Trop v. Dulles, supra,* 356 U.S. at 100–101, 78 S.Ct. at 598, 2 L.Ed.2d at 642.

3. *See Furman v. Georgia, supra,* 408 U.S. at 289–291, 92 S.Ct. at 2752–2753, 33 L.Ed.2d at 378–379 (Brennan, J., concurring); *id.* at 306, 309–310, 92 S.Ct. at 2760, 2762, 33 L.Ed.2d at 388, 389–390 (Stewart, J., concurring); *Gregg v. Georgia, supra,* 428 U.S. at 187, 188, 96 S.Ct. at 2931, 2932, 49 L.Ed.2d at 882, 883; *Woodson v. North Carolina, supra,* 428 U.S. at 294–296, 96 S.Ct. at 2991, 49 L.Ed.2d at 955–956; *Coker v. Georgia, supra,* 433 U.S. at 598, 97 S.Ct. at 2869, 53 L.Ed.2d at 993.

sanctity of human life,[4] unacceptably "cruel" according to our nation's contemporary moral standards. Ergo, the Court concluded that, absent absolute conformity with the procedural requirements created by it to insure that the death penalty would not be arbitrarily or capriciously imposed, any imposition of the death penalty by civilian courts would *per se* violate these contemporary societal concepts of cruelty, and, accordingly, violate the Eighth Amendment.[5]

In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) when the Court, for the first time,[6] actually addressed and rejected assertions that capital punishment, *per se,* constitutes cruel and unusual punishment prohibited by the Eighth Amendment, it based its decision upon a factual determination that our society's standards of decency had not yet evolved to the point that capital punishment can always be said to amount to "cruel and unusual" under the Eighth Amendment.[7] While the Court recognized that capital punishment may, on occasion, be unconstitutionally severe in relation to a crime for which it is authorized,[8] it specifically noted that "when a life has deliberately been taken by the offender, we cannot say that the punishment is invariably disproportionate to the crime."[9] In so holding, the Court recognized that a strong presumption as to

the validity of death penalty legislation continues to exist and that "a heavy burden rests on those who would attack [such] . . . judgment[s] of the representatives of the people."[10]

Far more significantly for our purposes here, however, the Court in *Gregg,* again for the first time, clearly announced what it considered to be the substance of its earlier holding in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); to wit: that "Because of the uniqueness of the death penalty, . . . it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary or capricious manner."[11] According to the *Gregg* Court, "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."[12]

In sum, wrestling with the measurement of the same type factors of "newly evolved standards of decency" as it had done in *Furman* and would continue to do in *Furman/Gregg* progeny (to wit: (1) whether, in the abstract, capital punishment is so severe and inhumane as to render it *per se*

---

4. *See Furman v. Georgia, supra,* 408 U.S. at 286, 92 S.Ct. at 2750, 33 L.Ed.2d at 376 (Brennan, J., concurring); *id.,* at 306, 92 S.Ct. at 2760, 33 L.Ed.2d at 388 (Stewart, J., concurring); *id.* at 369 n. 163, 92 S.Ct. at 2793 n. 163, 33 L.Ed.2d at 423–424 n. 163 (Marshall, J., concurring); *Gregg v. Georgia, supra,* 428 U.S. at 179–187, 96 S.Ct. at 2928–2931, 49 L.Ed.2d at 878–882; *id.* at 228–231, 96 S.Ct. at 2972–2973, 49 L.Ed.2d at 904–907 (Brennan, J., dissenting); *id.* at 231–232, 96 S.Ct. at 2973, 49 L.Ed.2d at 907 (Marshall, J., dissenting); *Woodson v. North Carolina, supra,* 428 U.S. at 294–296, 96 S.Ct. at 2991, 49 L.Ed.2d at 955–956; *Coker v. Georgia, supra,* 433 U.S. at 598, 97 S.Ct. at 2869, 53 L.Ed.2d at 993; *Lockett v. Ohio,* 438 U.S. 586, 626, 98 S.Ct. 2954, 2984, 57 L.Ed.2d 973, 1003 (1978) (White, J., concurring in part, dissenting in part); *Coleman v. Balkcom,* 451 U.S. 949, 960, 101 S.Ct. 2994, 2996, 68 L.Ed.2d 334, 340 (1981) (Rehnquist, J., dissenting).

5. *Gregg v. Georgia, supra,* 428 U.S. at 188–195, 96 S.Ct. at 2932–2936, 49 L.Ed.2d at 875, 883–887.

6. *Id.* at 168–169, 96 S.Ct. at 2922–2923, 49 L.Ed.2d at 871–872.

7. *Id.* at 168–187, 96 S.Ct. at 2922–2932, 49 L.Ed.2d at 871–883.

8. *Id.* at 173, 176–187, 96 S.Ct. at 2925, 2926–2932, 49 L.Ed.2d at 875, 876–883.

9. *Id.* at 187, 96 S.Ct. at 2932, 49 L.Ed.2d at 882.

10. *Id.* at 174–176, 96 S.Ct. at 2925–2926, 49 L,Ed.2d at 875–876.

11. *Id.* at 188, 96 S.Ct. at 2932, 49 L.Ed.2d at 883.

12. *Id.* at 188–189, 96 S.Ct. at 2932, 49 L.Ed.2d at 883.

cruel and unusual punishment,[13] (2) whether it is likely that, absent explicit procedural safeguards, society would impose capital punishment so arbitrarily as to render the capriciousness of its infliction, itself, cruel and unusual punishment,[14] (3) whether our contemporary civilian society's maturation process has so advanced, that it now substantially rejects capital punishment as cruel and unusual punishment *per se*[15] and (4)

13. See *Furman v. Georgia, supra,* 408 U.S. at 271–274, 282–291, 92 S.Ct. at 2742–2744, 2748–2753, 33 L.Ed.2d at 367–369, 374–379 (Brennan, J., concurring); *id.* at 306, 92 S.Ct. at 2760, 33 L.Ed.2d at 388 (Stewart, J., concurring); *id.* at 330, 333–342, 92 S.Ct. at 2773, 2774–2778, 33 L.Ed.2d at 402, 403–408 (Marshall, J., concurring); *Gregg v. Georgia, supra,* 428 U.S. at 173, 187, 96 S.Ct. at 2925, 2931, 49 L.Ed.2d at 874–875, 882; *id.* at 230–231, 96 S.Ct. at 2972–2973, 49 L.Ed.2d at 906 (Brennan, J., dissenting); *id.* at 231, 96 S.Ct. at 2973, 49 L.Ed.2d at 907 (Marshall, J., dissenting); *Coker v. Georgia, supra,* 433 U.S. at 598, 97 S.Ct. at 2869, 53 L.Ed.2d at 993; *id.* at 619, 97 S.Ct. at 2880, 53 L.Ed.2d at 1006 (Burger, C.J., dissenting); *Rhodes v. Chapman, supra,* 452 U.S. at 345–346, 101 S.Ct. at 2398, 69 L.Ed.2d at 68; *id.* at 361, 101 S.Ct. at 2406, 69 L.Ed.2d at 78 (Brennan, J., concurring); *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1, 8–9 (1982).

14. See *Furman v. Georgia, supra,* 408 U.S. at 240–257, 92 S.Ct. at 2727–2736, 33 L.Ed.2d at 350–360 (Douglas, J., concurring); *id.* at 274–277, 291–295, 92 S.Ct. at 2744–2746, 2753–2755, 33 L.Ed.2d at 369–371, 379–381 (Brennan, J., concurring); *id.* at 309–310, 92 S.Ct. at 2762–2763, 33 L.Ed.2d at 390 (Stewart, J., concurring); *id.* at 313–314, 92 S.Ct. at 2764–2765, 33 L.Ed.2d at 392 (White, J., concurring); *Gregg v. Georgia, supra,* 428 U.S. at 188, 189, 191–192, 193–195, 195 n. 46–47, 206–207, 96 S.Ct. at 2932, 2932, 2934, 2935, 2935–2936 n. 46–47, 2940, 2940–2941, 49 L.Ed.2d at 883, 883, 885, 886–887, 887 n. 46–47, 893, 893; *id.* at 220–223, 96 S.Ct. at 2947–2948, 49 L.Ed.2d at 900–902 (White, J., concurring); *Jurek v. Texas,* 428 U.S. 262, 278–279, 96 S.Ct. 2950, 2959, 49 L.Ed.2d 929, 942 (1976) (Blackmun, J., concurring); *Proffitt v. Florida,* 428 U.S. 242, 254 & n. 11, 260–261, 96 S.Ct. 2960, at 2967 & n. 11, 2970, 49 L.Ed.2d 913, at 924 & n. 11, 927–928 (1976); *Woodson v. North Carolina, supra,* 428 U.S. at 287 n. 8, 302–303, 96 S.Ct. at 2983 n. 8, 2990–2991, 49 L.Ed.2d at 951 n. 8, 959–960; *id.* at 316, 96 S.Ct. at 2996–2997, 49 L.Ed.2d at 968 (Rehnquist, J., dissenting); *Roberts v. Louisiana, supra,* 428 U.S. at 334–335, 96 S.Ct. at 3006–3007, 49 L.Ed.2d at 982; *id.,* 428 U.S. at 345–346, 96 S.Ct. at 3011–3012, 49 L.Ed.2d at 988–989 (White, J., dissenting); *Roberts v. Louisiana,* 431 U.S. 633, 644, 97 S.Ct. 1993, 1999, 52 L.Ed.2d 637, 646–647 (1977) (Rehnquist, J., dissenting); *Lockett v. Ohio, supra,* 438 U.S. at 597–602, 603–604, 98 S.Ct. at 2961–2963, 2964, 57 L.Ed.2d at 985–988, 989; *Godfrey v. Georgia,* 446 U.S. 420, 427–429, 100

S.Ct. 1759, 1764–1765, 64 L.Ed.2d 405–407 (1980); *id.* at 437–442, 100 S.Ct. at 1769–1772, 64 L.Ed.2d at 411–415 (Marshall, J., concurring); *Beck v. Alabama,* 447 U.S. 625, 639–641, 100 S.Ct. 2382, 2390–2391, 65 L.Ed.2d 392, 404–405 (1980); *Davis v. Georgia,* 451 U.S. 921, 921–923, 101 S.Ct. 2000, 2000–2001, 68 L.Ed.2d 312, 313 (1981) (Marshall, J., dissenting from denial of *certiorari*); *Hill v. Georgia,* 451 U.S. 923, 923–926, 101 S.Ct. 2001, 2002–2003, 68 L.Ed.2d 313, 314–315 (1981) (Marshall, J., dissenting from denial of *certiorari*); *Willis v. Balkcom,* 451 U.S. 926, 926–929, 101 S.Ct. 2003, 2004–2005, 68 L.Ed.2d 315, 315–316 (1981) (Marshall, J., dissenting from denial of *certiorari*); *Eddings v. Oklahoma, supra,* 455 U.S. at 110–112, 102 S.Ct. at 874–875, 71 L.Ed.2d at 8–10; *Zant v. Stephens,* 456 U.S. 410, 416–429, 102 S.Ct. 1856, 1859–1865, 72 L.Ed.2d 222, 225–235 (1982) (Marshall, J., dissenting); *Hopper v. Evans,* 456 U.S. 605, 609–613, 102 S.Ct. 2049, 2052–2053, 72 L.Ed.2d 367, 372–373 (1982); *Newlon v. Missouri,* —— U.S. ——, ——, 103 S.Ct. 185, 187–189, 74 L.Ed.2d 149, 151–152 (1982) (Marshall, J., dissenting from denial of *certiorari*); *Thomas v. Zant,* —— U.S. ——, ——, 103 S.Ct. 318, 319, 74 L.Ed.2d 295, 295 (1982) (Marshall, J., dissenting from denial of *certiorari*); *Ford v. Arkansas,* —— U.S. ——, ——, 103 S.Ct. 389, 389–390, 74 L.Ed.2d 519 (1982) (Marshall, J., dissenting from denial of *certiorari*); *Harvard v. Florida,* —— U.S. ——, ——, 103 S.Ct. 764, 767, 74 L.Ed.2d 979, 981 (1983) (Marshall, J., dissenting from denial of *certiorari*); *Baker v. Missouri,* —— U.S. ——, ——, 103 S.Ct. 834, 836–837, 74 L.Ed.2d 1027, 1029 (1983) (Marshall, J., dissenting from denial of *certiorari*).

15. See *Furman v. Georgia, supra,* 408 U.S. at 277–279, 295–300, 92 S.Ct. at 2746–2747, 2755–2757, 33 L.Ed.2d at 371–372, 381–384 (Brennan, J., concurring); *id.* at 360–369, 92 S.Ct. at 2788–1793, 33 L.Ed.2d at 418–423 (Marshall, J., concurring); *Gregg v. Georgia, supra,* 428 U.S. at 172–173, 174 n. 19, 175–176, 178–187, 184 n. 30, 190, 96 S.Ct. at 2925, 2925 n. 19, 2926, 2928–2932, 2930 n. 30, 2933, 49 L.Ed.2d at 874, 875 n. 19, 875–876, 877–882, 881 n. 30, 844; *id.* at 223, 228–230, 96 S.Ct. at 2948, 2971–2972, 49 L.Ed.2d at 904, 905–906 (Brennan, J., dissenting); *id.* at 232, 233, 240, 96 S.Ct. at 2973, 2974, 2977, 49 L.Ed.2d at 907, 908, 911–912 (Marshall, J., dissenting); *Woodson v. North Carolina, supra,* 428 U.S. at 288, 294–301, 299 n. 35, 301 n. 36, 96 S.Ct. at 2983, 2986–2989, 2988–2989 n. 35, 2989 n. 36, 49 L.Ed.2d at 951–952, 955–959, 958 n. 35, 959 n. 36; *id.* at 308–313, 96

whether the continued imposition of capital punishment serves any legitimate penal purpose more effectively than some less severe punishment,[16]), the Court in *Gregg* announced those contemporary societal standards of decency by which it would henceforth judge (and, in fact, has henceforth judged) the constitutionality of all capital punishment issues arising within our nation's civilian justice system. It determined that our civilian society's enlightened concept of humane justice can no longer tolerate the imposition of capital punish-

ment among its members if that punishment is either (1) unconstitutionally severe in relation to crimes for which it is authorized, or is (2) imposed under sentencing procedures that might create a substantial risk of its infliction in an arbitrary or capricious manner.[17]

## II

My fellow appellate military judges on the United States Courts of Military Review, seemingly abdicating their intended function [18] of assisting the Court of Military

S.Ct. at 2993–2995, 49 L.Ed.2d at 963–966 (Rehnquist, J., dissenting); *Roberts v. Louisiana, supra,* 428 U.S. at 332, 336, 96 S.Ct. at 3005–3006, 3007, 49 L.Ed.2d at 981, 983; *id.* at 350–354, 351 n. 4, 355–356, 358–359, 362 n. 8, 96 S.Ct. at 3014–3016, 3014 n. 4, 3016, 3017–3018, 3019 n. 8, 49 L.Ed.2d at 991–993, 992 n. 4, 994, 996, 998 n. 8 (White, J., dissenting); *Gardner v. Florida,* 430 U.S. 349, 357–358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393, 401–402 (1977); *Roberts v. Louisiana, supra,* 431 U.S. at 642–643, 644 n. 1, 97 S.Ct. at 1998–1999, 1999 n. 1, 52 L.Ed.2d at 645–646, 647 n. 1; *Coker v. Georgia, supra,* 433 U.S. at 596, 97 S.Ct. at 2868, 53 L.Ed.2d at 992; *id.* at 604, 97 S.Ct. at 2872, 53 L.Ed.2d at 996–997 (Powell, J., concurring in part and dissenting in part); *id.* at 606, 611, 614, 616–617, 621 n. 17, 97 S.Ct. at 2873, 2875–2876, 2877, 2878–2879, 2881 n. 17, 53 L.Ed.2d at 998, 1001, 1003, 1004–1005, 1007 n. 17 (Burger, C.J., dissenting); *Lockett v. Ohio, supra,* 438 U.S. at 625–626, 98 S.Ct. at 2983–2984, 57 L.Ed.2d at 1002–1003 (White, J., concurring in part and dissenting in part); *Rummell v. Estelle,* 445 U.S. 236, at 299 n. 19, 100 S.Ct. 1133, at 1152 n. 19, 63 L.Ed.2d 382, at 406–407 n. 19 (1980); *Enmund v. Florida, supra,* 458 U.S. at 794, 797, 102 S.Ct. at 3375, 3377, 73 L.Ed.2d at 1149–1150, 1151–1152; *id.* at 813–816, 818, 822, 826, 102 S.Ct. at 3385–3386, 3388, 3390, 3392, 73 L.Ed.2d at 1161–1163, 1166–1167, 1168, 1170 (O'Conner, J., dissenting).

**16.** *See Furman v. Georgia, supra,* 408 U.S. at 279–280, 300–305, 92 S.Ct. at 2747–2748, 2757–2760, 33 L.Ed.2d at 372–373, 384–387 (Brennan, J., concurring); *id.* at 308, 92 S.Ct. at 389, 33 L.Ed.2d at 2761 (Stewart, J., concurring); *id.* at 311–313, 92 S.Ct. at 2763–2764, 33 L.Ed.2d at 391–392 (White, J., concurring); *id.* at 342–359, 92 S.Ct. at 2779–2787, 33 L.Ed.2d at 408–418 (Marshall, J., concurring); *Gregg v. Georgia, supra,* 428 U.S. at 174 n. 19, 181–186, 184 n. 30, 190–191, 193–195, 96 S.Ct. at 2925 n. 19, 2929–2931, 2930 n. 30, 2933, 2934–2935, 49 L.Ed.2d at 875 n. 19, 879–882, 881 n. 30, 884–885, 886–887; *id.* at 228, 96 S.Ct. at 2971–2972, 49 L.Ed.2d at 905 (Brennan, J., dissenting); *id.* at

233–241, 239 n. 18, 96 S.Ct. at 2974–2977, 2977 at n. 18, 49 L.Ed.2d at 908–912, 911 n. 18 (Marshall, J., dissenting); *Proffitt v. Florida, supra,* 428 U.S. at 260–261, 96 S.Ct. at 2970, 49 L.Ed.2d at 927 (White, J., concurring); *Woodson v. North Carolina, supra,* 428 U.S. at 292 n. 25, 295–296, 96 S.Ct. at 2985 n. 25, 2986–2987, 49 L.Ed.2d at 953–954 n. 25, 955–956; *Roberts v. Louisiana, supra,* 428 U.S. at 353–356, 354 n. 7, 96 S.Ct. at 3015–3016, 3016 n. 7, 49 L.Ed.2d at 993–994, 993–994 n. 7 (White, J., dissenting); *Ingraham v. Wright, supra,* 430 U.S. at 687 n. 3, 97 S.Ct. at 1420 n. 3, 51 L.Ed.2d at 740 n. 3 (White, J., dissenting); *Coker v. Georgia, supra,* 433 U.S. at 616–618, 617 n. 11, 97 S.Ct. at 2878–2879, 2879 n. 11, 53 L.Ed.2d at 1004–1005, 1005 n. 11 (Burger, C.J., dissenting); *Lockett v. Ohio, supra,* 438 U.S. at 625–628, 98 S.Ct. at 2983–2985, 57 L.Ed.2d at 1002–1004 (White, J., concurring in part and dissenting in part); *Coleman v. Balkcom, supra,* 451 U.S. at 952, 101 S.Ct. at 2033, 68 L.Ed.2d at 336 (Stevens, J., concurring); *id.,* 451 U.S. at 958–961, 101 S.Ct. at 2995–2996, 68 L.Ed.2d at 339–340 (Rehnquist, J., dissenting); *Enmund v. Florida, supra,* 458 U.S. at 797–803, 102 S.Ct. at 3377–3379, 73 L.Ed.2d at 1152–1154; *id.* at 816 n. 42, 102 S.Ct. at 3392 n. 42, 73 L.Ed.2d at 1170 n. 42 (O'Connor, J., dissenting); *Newlon v. Missouri, supra,* —— U.S. at ——, 103 S.Ct. at 186, 74 L.Ed.2d at 150 (Marshall, J., dissenting from denial of *certiorari*); *Baker v. Missouri, supra,* —— U.S. at ——, 103 S.Ct. at 837, 74 L.Ed.2d at 1029–1030 (Marshall, J., dissenting from denial of *certiorari*).

**17.** *Gregg v. Georgia, supra,* 428 U.S. at 173, 176–187, 188–195, 96 S.Ct. at 2925, 2926–2932, 2932–2936, 49 L.Ed.2d at 875, 876–883, 883–887. *See also supra* notes 8, 11, 13, and 14.

**18.** My review of the Congressional Hearings and Floor Debates conducted on the U.C.M.J. prior to its passage in 1950 leads me to conclude that Congress intended the active duty military members of Courts/Boards of Military Review to resolve all "factual" matters requir-

Appeals by attempting to resolve issues requiring military expertise at the intermediate appellate level, have unanimously chosen to presume that the capital punishment holdings of *Furman* and its progeny are applicable to our nation's military, as well as civilian, justice system.[19] They have given no consideration at all to the pointed refusal of the United States Supreme Court in *Schick v. Reed,* 419 U.S. 256, at 260, 267–268, 95 S.Ct. 379, at 382, 386, 42 L.Ed.2d 430, at 435, 439 (1974), to attempt to determine whether *Furman* applies to the military[20] (a question which relates ultimately to whether a continued spectre of capital punishment in the U.C.M.J. is a matter of "military necessity") prior to a military court's exposition on the matter.[21]

ing an application of military expertise during their mandatory Article 66, U.C.M.J., 10 U.S.C. § 866, review of cases. The civilian judges of the Court of Military Appeals, whom Congress anticipated would lack such military acumen, were to consequently be restricted during their Article 67 examination to the purely legal, and presumably non-military, issues of a case. As expressed by Senator Morse during Senate Floor Debate on the proposed U.C.M.J. held on 3 February 1950:

Two objections have been interposed to the enactment of Article 67. The first is that it places final appellate power of cases tried by military courts in a civilian body, the members of which are not familiar with problems peculiar to the maintenance of discipline in the armed services. The powers of review of the proposed Court of Military Appeals are limited to matters of law. It would seem, therefore, that the court would not be required to pass upon questions which involve technical military knowledge .... If the question is not a pure question of law, then by the express provisions of Article 67(d) the Court of Military Appeals has no power to pass on it.... [T]o contend that a court which has jurisdiction only to decide questions of law might be required to decide mixed questions of fact and law is an absurdity.

96 Cong.Rec. 1442 (1950).

While short shrift was given to the last two quoted sentences by the Court of Military Appeals in *United States v. Flagg,* 11 U.S.C.M.A. 636, 640, 29 C.M.R. 452, 456 (1960), (the Court curtly announced that it was "empowered to re-examine" Court of Review decisions dealing with mixed questions of law and fact) certainly that particular decision in no way denigrates the expressed Congressional intent that the Court of Military Appeals should always have the benefit of a prior Court of Military Review decision on such matters.

**19.** *See United States v. Matthews,* 13 M.J. 501 (A.C.M.R.1982); *United States v. Rojas,* 15 M.J. 902 (N.M.C.M.R.1983); and the majority opinion in this case, *supra.*

**20.** *Schick v. Reed,* 419 U.S. 256, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974), decided only two years after *Furman v. Georgia, supra,* as emphasized in a consummately logical and stinging dissent by Justice Marshall (*See Schick v. Reed,* at 268–274, 95 S.Ct. at 386–389, 42 L.Ed.2d at 440–443 (Marshall, J., dissenting); *id.* at 271 n. 5, 95 S.Ct. at 387–388 n. 5, 42 L.Ed.2d at 441–442 n. 5), provided the Supreme Court with an excellent opportunity to squarely determine whether or not *Furman,* is applicable to the military. However, in a six to three decision, with only Justices Marshall, Douglas, and Brennan registering dissents, the Court specifically stated that: "[E]ven if *Furman v. Georgia* applies to the military, a matter which we do not and need not decide, it could not affect a conditional commutation which was granted 12 years earlier." *Schick v. Reed,* at 267–268, 95 S.Ct. at 386, 42 L.Ed.2d at 439.

**21.** Although the Court in *Schick,* did not expressly state its reasons for not deciding *Furman's,* applicability to the military, it has repeatedly expressed its reluctance in the past to rule upon matters of military necessity until military courts, with their peculiar expertise as to such matters, have first had an opportunity to espouse their views on the subject. *See Rostker v. Goldberg,* 453 U.S. 57, 64–72, 101 S.Ct. 2646, 2651–2655, 69 L.Ed.2d 478, 486–490 (1980); *Parker v. Levy,* 417 U.S. 733, 748, 94 S.Ct. 2547, 2558, 41 L.Ed.2d 439, 453 (1974); *Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2445–2446, 37 L.Ed.2d 407, 415–416 (1973); *Parisi v. Davidson,* 405 U.S. 34, 51, 92 S.Ct. 815, 825, 31 L.Ed.2d 17, 33 (1972); *Relford v. Commandant,* 401 U.S. 355, 368, 91 S.Ct. 649, 656, 28 L.Ed.2d 102, 110 (1971); *Noyd v. Bond,* 395 U.S. 683, 696, 89 S.Ct. 1876, 1884, 23 L.Ed.2d 631, 644 (1969); *Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 539–40, 97 L.Ed. 842, 849–50 (1953); *Gusik v. Schilder,* 340 U.S. 128, at 132, 71 S.Ct. 149, 152, 95 L.Ed. 146, 150 (1950); *Swaim v. United States,* 165 U.S. 553, 562, 17 S.Ct. 448, 451, 41 L.Ed. 823, 826 (1897); *Smith v. Whitney,* 116 U.S. 167, 178, 6 S.Ct. 570, 576, 29 L.Ed. 601, 604 (1886); *Dynes v. Hoover,* 61 U.S. (20 How.) 65, 82, 15 L.Ed. 838, 845 (1858). In fact, in *Middendorf v. Henry,* 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976), when confronted by a Court of Military Appeals decision purporting to extend the civilian 6th Amendment right to counsel to military personnel facing summary courts-martial, the Supreme Court took the unprecedented step of reversing that

Without comment, they have seemingly set to one side the very experience as professional military officers that uniquely qualifies them among all other members of our nation's judiciary to authoritatively determine those newly emerging individual rights that, although tolerable within the civilian society because they do not, there, directly affect the capacity of the Government to discharge its responsibilities, could well be intolerable within the military society where they might undermine that effectiveness of response to command that the Government must require in its military forces in order to effectively discharge its paramount responsibility of guaranteeing the security of the nation.[22] Instead, these possessors of military expertise inexplicably

and steadfastly restricted their consideration of capital punishment's continued viability in the armed forces to the purely nonmilitary, and perhaps inapplicable, legal issue of whether or not existing military justice sentencing procedures conform to the requirements that *Furman* and its progeny levied upon our nation's civilian courts.[23]

### III

The Supreme Court has often noted that our nation's military is, by necessity, a specialized society separate from its civilian society.[24] Whether couched in terms of disciplinary requirements[25] or constitutional mandate[26] the necessity for this societal

---

lower court's holding. Noting that the Court of Military Appeals had failed in *United States v. Alderman*, 22 U.S.C.M.A. 298, 46 C.M.R. 298 (1973), to decide whether "military necessity" might have dictated against extending this 6th Amendment right of counsel to those military personnel who appear before summary courts-martial, the Supreme Court announced that in the absence of such a specific determination, it would continue adhering to "Congress' previous determination that counsel is not required [in such cases]."

**22.** *See Parker v. Levy, supra,* 417 U.S. at 758–759, 94 S.Ct. at 2563, 41 L.Ed.2d at 459; *United States v. Priest,* 21 U.S.C.M.A. 564, 570, 45 C.M.R. 338, 344 (1972). *See also* the two axioms I set forth in *United States v. Newak,* 15 M.J. 541, 546 (A.F.C.M.R.1982) (Miller, J., concurring).

**23.** In *United States v. Matthews,* and *United States v. Rojas,* both *supra* note 19, a majority of the Army and the Navy Court asserted that military justice sentencing procedures conform to the procedural requirements of *Furman* and its progeny with respect to the constitutional imposition of capital punishment in our civilian society. The majority opinion in this case, *supra,* and the dissenters in *Matthews* assert that military sentencing procedures do not conform to the procedural requirements set forth in those cases. Consequently, they conclude capital punishment cannot currently be constitutionally imposed by military courts-martial.

**24.** *See Rostker v. Goldberg, supra,* 453 U.S. at 71, 101 S.Ct. at 2655, 69 L.Ed.2d at 490; *Brown v. Glines,* 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540, 547 (1980); *Department of the Air Force v. Rose,* 425 U.S. 352, 367–368, 96 S.Ct. 1592, 1602, 48 L.Ed.2d 11, 25 (1976); *Middendorf v. Henry, supra,* 425 U.S. at 49, 96

S.Ct. at 1294, 47 L.Ed.2d at 572 (Powell, J., concurring); *Greer v. Spock,* 424 U.S. 828, 843–844, 96 S.Ct. 1211, 1220, 47 L.Ed.2d 505, 517–518 (1976) (Powell, J., concurring); *Schlesinger v. Councilman,* 420 U.S. 738, 757, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591, 608 (1975); *Parker v. Levy, supra,* 417 U.S. at 743–744, 748, 756, 94 S.Ct. at 2555–2556, 2558, 2561–2562, 41 L.Ed.2d at 450–451, 453, 458; *Reid v. Covert,* 354 U.S. 1, 38–39, 77 S.Ct. 1222, 1241–1242, 1 L.Ed.2d 1148, 1175–1176 (1957); *Orloff v. Willoughby, supra,* 345 U.S. at 93–94, 73 S.Ct. at 540, 97 L.Ed. at 849.

**25.** *See Brown v. Glines, supra,* 444 U.S. at 354, 357, 360, 100 S.Ct. at 599, 601, 602, 62 L.Ed.2d at 547, 549, 551; *Department of the Air Force v. Rose, supra,* 425 U.S. at 367–368, 96 S.Ct. at 1602, 48 L.Ed.2d at 25; *Middendorf v. Henry, supra,* 425 U.S. at 49–51, 96 S.Ct. at 1294–1295, 47 L.Ed.2d at 572–573; *Schlesinger v. Councilman, supra,* 420 U.S. at 757–758, 95 S.Ct. at 1313, 43 L.Ed.2d at 609; *Parker v. Levy, supra,* 417 U.S. at 743, 748, 758–759, 94 S.Ct. at 2556, 2558–2559, 2563, 41 L.Ed.2d at 450, 453–455, 459; *id.,* 417 at 763, 94 S.Ct. at 2565, 41 L.Ed.2d at 464 (Blackmun, J., concurring); *id.,* at 789, 94 S.Ct. at 2577–2578, 41 L.Ed.2d at 476 (Stewart, J., dissenting); *O'Callahan v. Parker,* 395 U.S. 258, 265, 266, 89 S.Ct. 1683, 1686–1687, 1687, 23 L.Ed.2d 291, 297, 298 (1969); *Reid v. Covert, supra,* 354 U.S. at 35–36, 77 S.Ct. at 1240, 1 L.Ed.2d at 1174; *Swaim v. United States, supra,* 165 U.S. at 561–562, 17 S.Ct. at 451, 41 L.Ed.2d at 826 (1897); *United States v. Grimley,* 137 U.S. 147, 152–153, 11 S.Ct. 54, 55, 34 L.Ed. 636, 638–639 (1890); *Ex Parte Milligan,* 71 U.S. (4 Wall.) 2, at 123, 18 L.Ed. 281, 296 (1866).

**26.** *See Rostker v. Goldberg, supra,* 453 U.S. at 64–65, 68, 71, 101 S.Ct. at 2651–2652, 2653,

distinction clearly stems from the Court's judicial recognition of the fact that, no matter how distasteful it may be, the primary business of our armies and navies is to fight and be ready to fight wars should any occasion necessitate it.[27] Stripping this recognition to its bitter essence, it amounts to nothing more nor less than a recognition by the Supreme Court that regardless of the common moral values of our civilian society, its self-preservation requires an effective military force. It has also recognized that such a force can best be achieved via a military society apart from the civilian one; a society in which individual military members, who most often come directly from the civilian society, can be trained (or reprogrammed) to the point that, setting aside the teachings of a lifetime, they will be able to violently kill other human beings upon command and obey all commands of designated supervisors, even though by doing so, they may well subject themselves to a violent death.[28]

Regardless of the patriotism which motivates most professional military members; regardless of whether they are assigned to a combat role dropping ordinance on or sniping at unsuspecting enemy soldiers, or to a support role fixing teeth or attempting

2654, 69 L.Ed.2d at 486, 488, 490; *Brown v. Glines, supra,* 444 U.S. at 353, 100 S.Ct. at 598–599, 62 L.Ed.2d at 546–547; *Middendorf v. Henry, supra,* 425 U.S. at 43, 96 S.Ct. at 1291, 47 L.Ed.2d at 569; *id.* at 49–51, 96 S.Ct. at 1294–1295, 47 L.Ed.2d at 572–573 (Powell, J., concurring); *Greer v. Spock, supra,* 424 U.S. at 837, 840, 96 S.Ct. at 1217, 1218, 47 L.Ed.2d at 514, 515; *Schlesinger v. Councilman, supra,* 420 U.S. at 746, 95 S.Ct. at 1307, 43 L.Ed.2d at 602; *Schlesinger v. Ballard,* 419 U.S. 498, 510, 95 S.Ct. 572, 578, 42 L.Ed.2d 610, 619 (1975); *Parker v. Levy, supra,* 417 U.S. at 744, 94 S.Ct. at 2556, 41 L.Ed.2d at 451; *Relford v. Commandant, supra,* 401 U.S. at 367, 91 S.Ct. at 656, 28 L.Ed.2d at 110 (1971); *O'Callahan v. Parker, supra,* 395 U.S. at 261–262, 89 S.Ct. at 1685, 23 L.Ed.2d at 295–296; *id.* at 277, 89 S.Ct. at 1693, 23 L.Ed.2d at 304–305 (Harlan, J., dissenting); *Reid v. Covert, supra,* 354 U.S. at 19, 77 S.Ct. at 1231–1232, 1 L.Ed.2d at 1164–1165; *Fowler v. Wilkinson,* 353 U.S. 583, 584, 77 S.Ct. 1035, 1035–1036, 1 L.Ed.2d 1054, 1055, (1957); *Burns v. Wilson,* 346 U.S. 137, 140, 73 S.Ct. 1045, 1047–1048, 97 L.Ed. 1508, 1513–1514, (1953); *Ex Parte Milligan, supra,* 71 (4 Wall.) at 137, 18 L.Ed. at 301 (Chase, C.J., concurring); *Dynes v. Hoover, supra,* 61 U.S. (20 How.) at 78–79, 15 L.Ed. at 843 (1858).

**27.** *Rostker v. Goldberg, supra,* 453 U.S. at 70–71, 101 S.Ct. at 2654, 69 L.Ed.2d at 490; *Middendorf v. Henry, supra,* 425 U.S. at 46, 96 S.Ct. at 1293, 47 L.Ed.2d at 571; *Greer v. Spock, supra,* 424 U.S. at 837–838, 96 S.Ct. at 1217, 47 L.Ed. at 514; *Schlesinger v. Councilman, supra,* 420 U.S. at 757, 95 S.Ct. at 1313, 43 L.Ed.2d at 608; *Schlesinger v. Ballard, supra,* 419 U.S. at 510, 95 S.Ct. at 578, 42 L.Ed.2d at 619 (1975); *Parker v. Levy, supra,* 417 U.S. at 743, 94 S.Ct. at 2555–2556, 41 L.Ed.2d at 451, *Reid v. Covert, supra,* 354 U.S. at 35, 77 S.Ct. at 1240, 1 L.Ed.2d at 1173–1174; *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8, 14.

**28.** In part, this concept of a military society apart from our civilian one is necessitated by America's general societal denial of, and distaste for, the very armed forces, which it recognizes are necessary for its survival. There is scarcely a first year law student, for example, who, upon being first introduced to the concept of legalized homicide, does not feel at least a twinge of moral indignation or surprise. As members of a civilian society, where the incomparable value of individual human life is constantly reinforced upon its citizenry, these students are usually ill-prepared for their professors' inevitable graphic demonstration that individual members of our society are actually paid to legally kill criminals sentenced to death, but that, in time of war, our nation's soldiers are paid to aggressively (not strictly in self-defense) kill enemy soldiers, guilty of no crime other than possible patriotism, whenever and wherever they might appear, capable of fighting, in a combat zone. Usually, most have more difficulty rationalizing the soldiers' actions against the non-aggressive, criminally innocent enemy than the public executioner's killing of a sentenced criminal. Ultimately the actions of the former, are normally rationalized by analogizing them to the seemingly more acceptable public service performed by the latter. The task facing the armed forces in receiving and incorporating far less sophisticated members of this same civilian society into a military society, where, rather than merely being required to accept a concept that some other person may, on occasion, be required to legally kill a fellow human being, they, themselves, are expected, at the risk of their own lives, to do this killing, is infinitely more complicated. Simply stated, it involves transitioning a typical recruit from a society that disdains death and violence into one in which he or she must accept it as a part of everyday life. It involves nothing short of re-programming a sizable portion of their lifelong value systems, at least with respect to their acceptance of military mission.

to interpret military jurisprudence: stripped to its bitter essence, the only business, mission, or purpose for being, of individuals in the armed forces is to be prepared, when it is necessary in the judgment of our nation's leaders, to violently kill other decent human beings that happen to be serving with an enemy army and to obey the commands of their own supervisors, even though these commands may likely result in their imminent death.

It was the recognition of the "foreignness" of these concepts to America's civilian society that caused our founding fathers to initially create the constitutional dichotomies which resulted in both a separate justice system for our nation's armed forces and the recognition that as a result of the peculiar requirements of military service, military members may be deprived of certain individual rights constitutionally guaranteed to members of our society as a whole.[29] It was this recognition that caused Supreme Court Justices throughout our history, despite sundry attitudinal changes within our civilian society with respect to the desirability of a separate military justice system, to keep this constitutional separation of justice systems inviolate.[30] It is this recognition that has, in recent years, despite the tide of judicial activism which has immensely expanded the scope of individual human rights guaranteed by the constitution, caused the present Justices of our Supreme Court to repeatedly recognize that any extension of these expanded individual rights applicable in our civilian society to members of our military society, must be approached cautiously, with an eye to whether "military necessity" might preclude such an expansion.[31] And it is this recognition that has caused these same Justices, to recently preclude extension of such rights to military members in several 1st, 5th and 6th Amendment cases.[32]

**29.** *See* my concurring opinion in *United States v. Newak, supra,* 15 M.J. at 546–549 (Miller, J., concurring).

**30.** *See id.* at 549–563 (Miller, J., concurring).

**31.** *See Saye v. Williams,* 452 U.S. 926, 929, 101 S.Ct. 3063, 3065, 69 L.Ed.2d 428, at 430 (1981) (Rhenquist, J., dissenting from denial of *certiorari*); *Rostker v. Goldberg, supra,* 453 U.S. at 66, 101 S.Ct. at 2652, 60 L.Ed.2d at 487; *Brown v. Glines, supra,* 444 U.S. at 354–361, 100 S.Ct. at 599–603, 62 L.Ed.2d at 547–551; *Middendorf v. Henry, supra,* 425 U.S. at 44, 96 S.Ct. at 1292, 47 L.Ed.2d at 569–570; *id.* at 50–51, 50 n. 2, 96 S.Ct. at 1295 & n. 2, 47 L.Ed.2d at 573 & n. 2 (Powell, J., concurring); *id.* at 63–65, 67–69, 66 n. 20, 96 S.Ct. at 1301–1302, 1303–1304, 1302–1303 n. 20, 47 L.Ed.2d at 581–582, 583–584, 582–583 n. 20 (Marshall, J., dissenting); *Greer v. Spock, supra,* 424 U.S. at 837, 840, 96 S.Ct. at 1217, 1218, 47 L.Ed.2d at 514, 515; *Schlesinger v. Councilman, supra,* 420 U.S. at 757–758, 95 S.Ct. at 1313, 43 L.Ed.2d at 609; *Parker v. Levy, supra,* 417 U.S. at 758–759, 94 S.Ct. at 2563, 41 L.Ed.2d at 459; *Reid v. Covert, supra,* 354 U.S. at 38–39, 77 S.Ct. at 1241–1242, 1 L.Ed.2d at 1175–1176; *Gibson v. United States,* 329 U.S. 338, 358–359, 67 S.Ct. 301, 311, 91 L.Ed. 331, 346 (1946).

**32.** *See Perry Educ. Assn. v. Perry Local Educators' Assn,* —— U.S. ——, ——, 103 S.Ct. 948, 956, 74 L.Ed.2d 794, 806 (1983) (1st Amendment-freedom of speech); *Dallas County Hospital District v. Dallas Association of Community Organizations for Reform Now,* —— U.S. ——, 103 S.Ct. 471, 74 L.Ed.2d 619 (1982) (Rhenquist, J., dissenting from denial of certiorari) (1st Amendment-freedom of speech); *U.S. Postal Service v. Council of Greenburgh,* 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517, 530 (1st Amendment-freedom of access); *Rostker v. Goldberg, supra,* 453 U.S. at 66–68, 72–83, 101 S.Ct. at 2652–2653, 2655–2660, 69 L.Ed.2d at 487–490, 491–497 (1st Amendment-vagueness-overbreadth-freedom of speech-freedom to petition, 5th Amendment-due process-gender discrimination); *Brown v. Glines, supra,* 444 U.S. at 354, 100 S.Ct. at 599, 62 L.Ed.2d at 547–548 (1st Amendment-right to petition); *Middendorf v. Henry, supra,* 425 U.S. at 35–38, 42–44, 96 S.Ct. at 1287–1289, 1291–1292, 47 L.Ed.2d at 564–566, 569–570 (5th Amendment-due process-deprivation of liberty); *id.* at 35, 96 S.Ct. at 1287, 47 L.Ed.2d at 564 (6th Amendment-right to counsel); *id.* at 72, 96 S.Ct. at 1305, 47 L.Ed.2d at 586 (Marshall, J., dissenting) (6th Amendment-right to counsel); *id.* at 53 n. 2, 96 S.Ct. at 1298 n. 2, 47 L.Ed.2d at 575 n. 2 (Marshall, J., dissenting) (5th Amendment-right to grand jury indictment); *Greer v. Spock, supra,* 424 U.S. at 837–838, 838 n. 10, 96 S.Ct. at 1217, 1217 n. 10, 47 L.Ed.2d at 514, 514 n. 10 (1st Amendment-freedom of speech); *Schlesinger v. Ballard, supra,* 419 U.S. at 508, 95 S.Ct. at 572, 42 L.Ed.2d at 610 (5th Amendment-due process-gender discrimination); *Parker v. Levy, supra,* 417 U.S. at 756, 758, 94 S.Ct. at 2561, 2563, 41 L.Ed.2d at 457–458, 459 (1st Amendment-vagueness-overbreadth). *See also Schick v. Reed, supra,* 419 U.S. at 260, 267–268, 95 S.Ct. at 382, 386, 42 L.Ed.2d at 435,

## IV

Apparently contrary to the views of other members of the United States Courts of Military Review,[33] I deeply believe that before the Supreme Court (or for that matter, any other civilian court) applies any newly expanded constitutional right to our nation's military justice system, it is entitled to (and, in fact, must) know the likely effect of that application upon the Executive's ability (through our armed forces) to secure this nation's sovereignty. For unless that sovereignty is secured, the Supreme Court, of course, is powerless to perform its function of interpreting the breadth of such constitutional rights at all.[34] Accordingly, as an appellate military judge, I consider myself compelled to set forth my personal views of the likely effect such an application of the expanded 8th amendment right addressed, herein, would have upon the effectiveness of our armed forces, should it ever be deemed applicable to military jurisprudence.

As I established in section I of this opinion, the Supreme Court's determination that capital punishment cannot be imposed in civilian society unless done so under sen-

tencing procedures that guarantee a minimization of risk that it might be imposed in an arbitrary or capricious manner was based directly upon that Court's perception that our civilian society's "evolving standards of decency" had so "enlightened its conception of humane justice" as to render any arbitrary or capricious imposition of a punishment that extinguishes the "sanctity" of human life unacceptably "cruel" according to its contemporary moral standards.

Had the Court similarly determined that our *military society*'s "evolving standards of decency" had so "enlightened *its* conceptions of humane justice" as to render the arbitrary or capricious imposition of death penalties unacceptably "cruel" according to *its* contemporary moral standards, the Court would, in effect, have admitted that the constitutional purpose of separating our nation's military and civilian societies (to wit: the assurance that this basically pacifist oriented nation of ours would, forever, maintain an effective fighting force capable and willing, on a moment's notice, of killing and being killed in its defense [35]) had failed.

439 (8th Amendment-death penalty); *id.* at 271 n. 5, 95 S.Ct. at 387–388 n. 5, 42 L.Ed.2d at 441–442 n. 5 (Marshall, J., dissenting) (8th Amendment-death penalty).

**33.** *See supra,* section II of this dissenting opinion.

**34.** *See* my opinion in *United States v. Newak, supra,* 15 M.J. at 545–549 (A.F.C.M.R.1982) (Miller, J., concurring); *see also supra* note 21.

**35.** When in 1775, our founding fathers decided to attempt to throw off the bonds of British authoritarian rule, they attended to first priorities by penning The Massachusetts Articles of War, a full year before they took the time necessary to create and sign the Declaration of Independence.

And whereas we are frequently told by the tools of the administration, dupes to Ministerial usurpation, that Great Britain will not in any degree relax in her measures until we acknowledge her "right of making laws binding upon us in all cases whatsoever," and that if we persist in our denial of her claim, the dispute must be decided by Arms, in which it is said by our enemies "we shall have no chance, being undisciplined, cowards, disobedient, impatient of command, and

possessed of that spirit of reveling which admits of no order, subordination, rule, or government."

And whereas the Ministerial Army and Fleet now at Boston, the large reinforcement of Troops expected, the late Circular Letter to the Governours, upon the Continent, the general tenour of intelligence from Great Britain and the hostile preparations making here, as also from the threats and repeated insults of our enemies in the Capital Town, we have reason to apprehend that the sudden destruction of this Province is in contemplation if not determined upon.

And whereas *the great law of self-preservation may suddenly require our raising and keeping an Army of observation and defence,* in order to prevent or repel any further attempt to force the late cruel and oppressive Acts of the British Parliament, which are evidently designed to subject us and the whole Continent to the most ignominious slavery. And whereas, *in case of raising and keeping such an Army it will be necessary that the Officers and Soldiers in the same be fully acquainted with their duty, and that the Articles, Rules and Regulations thereof be made as plain as possible;* and having great confidence in the honour and public virtue of

The Court did not, however, engage in any such considerations. Rather, as is obvious from its outright avoidance of this latter subject in *Schick v. Reed, supra,* it chose to allow our nation's military courts, with their presumed unique military expertise, to initially determine whether (1) "evolving standards of decency" regarding "humane justice" in military society have coincided with those of the civilian society and, if not, then (2) whether or not, a superimposition of the Court's *Furman/Gregg* holdings upon military justice might so intolerably undermine that effectiveness of response to command which the Executive must demand of its military forces to effectively discharge its paramount responsibility of guaranteeing the security of the nation, as to preclude the feasibility of such a superimposition.[36]

### A

Turning my attention to the first of these questions, I happily report that the constitutional purpose of separating the nation's military and civilian societies has not failed. To the contrary, my measurement of the attitudes of military members with respect to the same four factors used in *Furman* and its progeny to measure civilian attitudes reflects that our constitutionally conceived separation of the two societies continues to achieve exactly the mindset necessary for members of our military forces to effectively defend our nation.

(1) *In the abstract, do military members consider capital punishment so severe and inhumane as to render its imposition cruel and unusual punishment, per se?* Having been successfully trained to accept personal risk of their own lives as a necessary eventuality of battlefield combat, military personnel do not reject the concept of a convicted criminal's execution as unduly severe or inhumane. To the contrary, just as they have been taught that the possibility of their own deaths are a necessary reality flowing from their choice of occupation, they regard the possible execution of crimi-

the inhabitants of this Colony that they will readily obey the Officers chosen by themselves, and will cheerfully do their duty when known without any such severe Articles and Rules, (except in capital cases,) and cruel punishments as are usually practised in Standing Armies, and will submit to all such Rules and Regulations as are founded in reason, honour and virtue. [While the Articles, Rules and Regulations do in many cases provide that a violator may be punished as a court-martial may direct, the 50th Article specifically prohibits a court-martial from sentencing a violator to be whipped or to receive more than thirty-nine stripes per offense.] It is, therefore,

RESOLVED, That *the following Articles, Rules and Regulations for the Army that may be raised for the defence and security of our lives, liberties, and estates, be and are hereby earnestly recommended to be, strictly adhered to, by all Officers, Soldiers, and others concerned, as they regard their own honour and the publick good.*

THE MASSACHUSETTS ARTICLES OF WAR, April 5, 1775, in Winthrop, Military Law and Precedents 947 (2d ed. 1920) (Emphasis added).

Nor did our founding fathers fail to recognize the continued necessity of maintaining this separate body of citizenry when they convened the Constitutional Convention after the conclusion of the revolutionary war. For, at the same time they set forth the individual rights that were to be guaranteed to their civilian citizenry, they acted to insure the security of these rights via a unique and bold scheme designed specifically to assure that their new peace loving nation would forever maintain a combat ready and effective armed force completely responsive to the immediate and flexible control of the central government. The ingenious framers of the Constitution placed responsibility for establishing a separate Government for the Armed Forces in the Legislature, while placing its operational control in the President. By so doing, they provided: first, a society separate and apart from the civilian society, in which this force could be disciplined and trained in an imperative mission so "foreign" to the basic values of the civilian society as a whole; second, a prompt but reasoned method of changing the government of the armed forces should some unforeseen exigency require such a change (simple enactment of a law rather than a complex change to the Constitution); and third, immediate and total control in the President of both the operations of the armed force and, hierarchically, the actions of every individual in it within the framework of its then existing system of government.

**36.** *See Parker v. Levy, supra,* 417 U.S. at 758–759, 94 S.Ct. at 2563, 41 L.Ed.2d at 459; *United States v. Priest, supra,* 21 U.S.C.M.A. at 570, 45 C.M.R. at 344. *See also* the two axioms I set forth in *United States v. Newak, supra,* 15 M.J. at 546 (A.F.C.M.R.1982) (Miller, J., concurring).

nals as a necessary reality flowing from the decisions of these individuals to commit heinous crimes.

(2) *Is it likely that, absent procedural safeguards, members of our military society would impose capital punishment so arbitrarily as to render the capriciousness of its infliction, itself, cruel and unusual punishment?* Because they live with risk of untimely death, military members, may be said to more fully appreciate the value of day-to-day living than does the general population as a whole. As a result, they are far less likely to lightly deprive another human being of his life than are members of the civilian population as a whole. Additionally, Congress, by enacting the U.C. M.J., and the President, by executive order, have already provided two important legislative safeguards against arbitrary or capricious imposition of the death penalty, unknown in our nation's civilian court system. As a result of the first, applicable to the imposition of any punishment at courts-martial, an accused has a right to be sentenced by an *educated* jury (he is entitled to a court panel composed exclusively of officers, most of whom, today, are college graduates).[37] As a result of the second, he can not be executed unless *the President of the United States, himself,* after reviewing all sentencing matters presented on the accused's behalf, personally approves and signs the action or order that will ultimately result in his execution.[38]

(3) *Has our contemporary military society's maturation process so advanced that it now substantially rejects all capital punishment as cruel and unusual punishment, per se?* Moral developments in this nation's civilian society that have recently so sanctified the value of individual human life that portions of that society are now calling for a re-definition of life, itself, have had a far less marked effect upon its military society's view of human life. To the contrary, our nation's leaders have continued to perform their constitutionally conceived task of instilling military personnel with that distinctly different mindset regarding the sanctity of individual human life which is necessary to effectively accomplish the previously referenced unique societal mission required of them. Because of their leaders' success in this task, military personnel have continued to accept, as morally proper, the concept of legally executing criminals sentenced to death by courts-martial.

(4) *Does the continued imposition of capital punishment within our nation's military society serve any legitimate penal purpose more effectively than would some less severe punishment?* While there is never a need within the civilian community for one of its members to choose between risk of life or criminal punishment, that need must ever be present in the minds of an effective fighting force. The fundamental right to life that guarantees members of our civilian society that they will never be faced with a choice between obeying an order to subject themselves to almost certain death or disobeying that order and, as a consequence, absent killing the witnesses to their refusal, facing criminal punishment, is inapplicable to military personnel. Rather, the eventuality of a military member's receiving such an order and the subsequent alternative choices that such an order presents constitute the genesis of the extraordinarily strict discipline that has always distinguished any effective military force from its civilian society. Unless every member of such a fighting force can be relied upon to unquestionably obey such orders, the additional risk to life of that force's members and the subsequent psychological effect upon force morale of the reasons for that additional risk of life, would tear the military effectiveness of such a force asunder. Training in regard to matters of such grave personal concern to all our military personnel cannot begin only upon a declaration of war or on a battlefield.[39] Rather, it must be constant-

---

**37.** *See* Article 25(c), U.C.M.J., 10 U.S.C. § 825(c).

**38.** *See* M.C.M., 1969 (Rev.), paragraph 98.

**39.** *See* factors involved in maintaining a modern fighting force cited by C.J. Everett in *United States v. Trottier,* 9 M.J. 337, 345–348 (C.M. A.1980).

ly taught and reinforced during time of war or peace, whenever and wherever possible. In our military as opposed to civilian society, elimination of the potential spectre of capital punishment could well result in a marked increase in violent crimes among and between the members of our armed forces. Certainly, an individual, such as the accused in this case who killed his superior because that supervisor had insisted that he get a haircut, would have no hesitancy in choosing to kill a superior who might order him to face a risk of death in combat, particularly if, by doing so, he is able to totally avoid the risk of dying, even pursuant to court-martial. But, what of the, now, totally acceptable and obedient soldier? If that regard for the "sanctity of life" that underlies *Furman/Gregg* procedural sentencing requirements is applied to his society, might he not, too, come to so value his own life, that he considers the risk of jailtime for murder preferable to obeying an order that is likely to end his life? And, what will be the reaction of those troops in the field still willing to risk their own lives to those individuals who might prefer murder and jail time to such risks, particularly when the former recognize that the latter can not be sentenced to death for their cowardly offenses in a court of law? Can it be asserted with any surety, that by eliminating the death penalty in our military society, we are not simply substituting vigilante justice for the sophisticated principles of military jurisprudence? Certainly, the imposition of capital punishment in military society continues to serve legitimate penal and disciplinary purposes.

Having determined from my review of our military society's "evolving standards of decency" regarding "humane justice" that the Supreme Court's rationale for mandating that "where [in civilian courts] discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk

of wholly arbitrary and capricious action," [40] is wholly inapplicable to military society, I now turn my attention specifically to the question of whether or not a superimposition of this rationale upon our military justice system might so intolerably undermine our nation's military effectiveness as to deprive the Executive of the means by which it must guarantee national security.

### B

In evaluating the effect of superimposing the Supreme Court's rationale for curtailing the imposition of capital punishment in our nation's civilian society, upon our nation's military society, I believe that I, as a judge charged, at least in part, with guarding our nation's civil liberties, must squarely address and answer two extremely distasteful socio-political questions.

The first of these I resolved in my earlier discussion of the applicability of the fourth *Furman* factor (whether capital punishment serves any legitimate penal purpose not served just as effectively by some less severe punishment) to the military. It asks: Might not the additional risk of life to military members and the resultant psychological effect upon them of the reasons for this additional risk to their lives that is likely to flow from an elimination of the death penalty from military justice, tear asunder the strict military discipline that is absolutely essential to an effective military force?

The answer, for the reasons I have previously set forth, is a resounding, yes!

The second asks: Whether an individual service member, whose "enlightened concepts of humane justice" prevent him from executing, absent strict adherence to the gravest non-substantive procedural precautions, a fellow service member who has both senselessly killed an immediate supervisor and attempted to kill fellow subordinates by firing at them with an M–16 rifle in

---

**40.** *See Gregg v. Georgia, supra*, 428 U.S. at    188–189, 96 S.Ct. at 2932, 49 L.Ed.2d at 883.

automatic firing mode, can be relied upon to kill other non-criminal human beings, upon command?

I established in section III, above, that the quintessential justification of this nation's separate system of military justice has always been the maintenance of a body of citizenry, in our otherwise pacifist oriented nation, that is prepared, trained, and willing on a moment's notice to kill and be killed in defense of our civilian community's right to practice this pacifism.[41]

**41.** In the collective mind of today's Supreme Court these fundamental realities clearly continue to temper the applicability of its constitutional decisions to our nation's military forces.

This court has long recognized that the military is, by necessity, a specialized society separate from civilian society. We have also recognized that the military has, again by necessity, developed laws and traditions of its own during its long history. The differences between the military and civilian communities result from the fact that "it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise." *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 17 [76 S.Ct. 1, 5, 100 L.Ed. 8] (1955)... We have also recognized that a military officer holds a particular position of responsibility and command in the Armed Forces....

Just as military society has been a society apart from civilian society, so "[m]ilitary law ... is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment." *Burns v. Wilson, supra* [346 U.S. 137], at 140 [73 S.Ct. 1045, 1047, 97 L.Ed. 1508 (1953)]. And to maintain the discipline essential to perform its mission effectively, the military has developed what "may not unfitly be called the customary military law" or "general usage of the military service." *Martin v. Mott,* 12 Wheat. 19, 35 [6 L.Ed. 537] (1827).

. . . .

Decisions of this Court during the last century have recognized that the longstanding customs and usages of the services impart accepted meaning to the seemingly imprecise standards of Arts. 133 and 134.

. . . .

The Court of Claims decision which the Court affirmed in [*United States v.*] *Fletcher* [148 U.S. 84, 13 S.Ct. 552, 37 L.Ed. 378 (1893)] stressed the military's "higher code termed honor, which holds its society to stricter accountability and with which those trained only in civilian law are unfamiliar. In *Swaim v. United States,* 165 U.S. 553 [17 S.Ct. 448, 41 L.Ed. 823] (1897) ... the Court said:

"[T]his is the very matter that falls within the province of courts-martial, and in respect to which their conclusions cannot be controlled or reviewed by the civil courts.

. . . .

That Code [the Uniform Code of Military Justice] cannot be equated to a civilian criminal code. It, and the various versions of the Articles of War which have preceded it, regulate aspects of the conduct of members of the military which in the civilian sphere are left unregulated. While a civilian criminal code carves out a relatively small segment of potential conduct and declares it criminal, the Uniform Code of Military Justice essays more varied regulation of a much larger segment of the activities of the more tightly knit military community.

... In short, the Uniform Code of Military Justice regulates a far broader range of the conduct of military personnel than a typical state criminal code regulates of the conduct of civilians....

[There is a] different relationship of the Government to members of the military. It is not only that of lawgiver to citizen, but also that of employer to employee. Indeed, unlike the civilian situation, the Government is often employer, landlord, provisioner, and lawgiver rolled into one. That relationship also reflects the different purposes of the two communities.... While members of the military community enjoy many of the same rights and bear many of the same burdens as do members of the civilian community, within the military community there is simply not the same autonomy as there is in the larger civilian community. The military establishment is subject to the control of the civilian Commander in Chief and the civilian departmental heads under him, and its function is to carry out the policies made by those civilian superiors.

. . . .

For the reasons which differentiate military society from civilian society, we think Congress is permitted to legislate both with greater breadth and with greater flexibility when prescribing the rules by which the former shall be governed than it is when prescribing rules for the latter.

. . . .

The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it.... The United States Court of Military Appeals has sensibly expounded the reason for this different application of First Amendment doctrines in its opinion in *United States v. Priest,* 21 U.S.C.M.A., at 570, 45 C.M.R., at 344:

"In the armed forces some restrictions exist for reasons that have no counterpart in the civilian community. Disrespectful and contemptuous speech, even advocacy of violent change, is tolerable in the civilian community, for it does not directly affect the capacity of the Government to discharge its

For well over two centuries this need for a separate military justice system designed specifically to foster and control, through strict regimens of unyielding physical and psychological disciplines, the distinctly different mindset regarding the sanctity of human life, that servicemen must necessarily acquire in order to effectively accomplish this essential mission, has remained, basically,[42] unchallenged.

Having carefully considered the answer to this second question in this light, I am personally convinced that the infusion into our separate military society of such fundamentally pacifist thought as is espoused by the holdings of *Furman* and its progeny might well end this nation's historically protected capacity to provide the non-pacifist atmosphere required to efficiently mold members of our nation's fighting forces into the type of effective fighting force that remains necessary for our nation's survival in today's world.

## V

Based upon my answers to these two questions and my review in Section III, herein, of those standards that the Supreme Court has recently used in determining the

---

responsibilities unless it both is directed to inciting imminent lawless action and is likely to produce such action. *Brandenburg v. Ohio,* [395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969)]. In military life, however, other considerations must be weighed. The armed forces depend on a command structure that at times must commit men to combat, not only hazarding their lives but ultimately involving the security of the Nation itself. Speech that is protected in the civil population may nonetheless undermine the effectiveness of response to command. *Parker v. Levy, supra,* 417 U.S. at 743–744, 746–747, 748, 749, 750–751, 756, 758–759, 94 S.Ct. at 2555–2556, 2557, 2558, 2558, 2559, 2561–2562, 2563, 41 L.Ed.2d at 450–451, 452, 453, 454, 454–455, 458, 459. *Cited in Rostker v. Goldberg, supra,* 453 U.S. at 66, 101 S.Ct. at 2654, 69 L.Ed.2d at 486; *Brown v. Glines, supra,* 444 U.S. at 354, 100 S.Ct. at 599, 62 L.Ed.2d at 547–548; *Department of the Air Force v. Rose, supra,* 425 U.S. at 367–368, 96 S.Ct. at 1592, 48 L.Ed.2d at 25; *Middendorf v. Henry, supra,* 425 U.S. at 38, 96 S.Ct. at 1289, 47 L.Ed.2d at 566; *id.* at 49–50, 96 S.Ct. at 1294–1295, 47 L.Ed.2d at 572–573 (Powell, J., concurring); *Greer v. Spock, supra,* 424 U.S. at 844, 96 S.Ct. at 1220, 47 L.Ed.2d at 518 (Powell, J., concurring); *Schlesinger v. Councilman, supra,* 420 U.S. at 746, 757, 95 S.Ct. at 1307, 1313, 43 L.Ed.2d at 602, 603.
See also *supra* note 34 and section III of this opinion.

**42.** The sole apparent judicial challenge to the traditional justifications underlying this fundamental concept of a separate and distinct military society was more perceived, than real. Following publication of *O'Callahan v. Parker, supra* note 25, in 1969, substantial portions of the military's legal community expressed concern that the Supreme Court had become hypercritical of the quality of "justice" dispensed by the military's separate justice system and that it might be preparing to merge the separate military justice system into its existing civilian counterpart. These concerns stemmed from certain statements contained in the Court's opinion, including those that said, "A court-martial is not yet an independent instrument of justice but remains to a significant degree a specialized part of the overall mechanism by which military discipline is preserved," "A civilian trial, in other words, is held in an atmosphere conducive to the protection of individual rights, while a military trial is marked by the age-old manifest destiny of retributive justice," and "None of the travesties of justice perpetrated under the UCMJ is really very surprising, for military law has always been and continues to be primarily an instrument of discipline, not justice," *O'Callahan,* 395 U.S. at 265–266, 89 S.Ct. at 1686–1687, 23 L.Ed.2d at 297–298. Since the case's initial publication, however, it has become clear from the Court's subsequent decisions (*see* cases cited note 25 *supra*) that, as *O'Callahan* itself had recognized by stating few would deny "a system of specialized military courts, proceeding by practices different from those obtaining in the regular courts and in general less favorable to defendants, is necessary to an effective national defense establishment ...," these initial fears were totally unjustified. In retrospect, while *O'Callahan* heralded what might aptly be described as an era of scrutiny of restrictions within the military upon newly evolving constitutional rights identified by the Supreme Court, it by no means guaranteed the same or equal application of all such newly evolved rights to military personnel. Rather the Court has continued to recognize that the military justice system must function as an instrument of discipline as well as justice, and, as a result, has frequently modified the applicability of such newly emerging individual rights to military personnel, as a matter of military necessity, whenever it perceives that the military's ability to perform its imperative mission might be adversely effected. *See* cases cited *supra* note 32.

applicability of newly enunciated civil rights to our separate military society that are far more tangential to the maintenance of discipline than the one discussed here,[43] I conclude that the expanded notions of individual rights espoused in *Furman* and its progeny must not be applied in military courts. The very real risk that such an application might severely undermine the military effectiveness of our armed forces, essential for the Executive to guarantee this nation's security, is simply intolerable.

Accordingly, having declared the principles upon which the majority set aside the accused's capital punishment sentence inapplicable, I would affirm both the findings and sentence as adjudged.

**43.** The operation of a healthy deference to legislative and executive judgments in the areas of military affairs is evident in several recent decisions of this Court. In *Parker v. Levy,* the Court rejected both vagueness and overbreadth challenges to provisions of the Uniform Code of Military Justice, noting that "Congress is permitted to legislate both with greater breadth and with greater flexibility" when the statute governs military society, and that "[w]hile the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections." In *Middendorf v. Henry,* the Court noted that in considering due process claims in the context of summary court-martial it "must give particular deference to the determination of Congress, made under its authority to regulate the land and naval forces, U.S. Const, Art. I, § 8," concerning what rights were available. Deference to the judgment of other branches in the area of military affairs also played a major role in *Greer v. Spock* where the Court upheld a ban on political speeches by civilians on a military base, and *Brown v. Glines,* where the Court upheld regulations imposing a prior restraint on the right to petition of military personnel.

In *Schlesinger v. Ballard, supra,* the Court considered a due process challenge, brought by males, to the Navy policy of according females a longer period than males in which to attain promotions necessary to continued service. The Court distinguished previous gender-based discriminations held unlawful in *Reed v. Reed* and *Frontiero v. Richardson.* In those cases, the classifications were based on "overbroad generalizations." In the case before it, however, the Court noted:

"[T]he different treatment of men and women naval officers ... reflects, not archaic and overbroad generalizations, but, instead, the demonstrable fact that male and female line officers in the Navy are *not* similarly situated with respect to opportunities for professional service. Appellee has not challenged the current restriction on women officers' participation in combat and in most sea duty."

In light of the combat restrictions, women did not have the same opportunities for promotion as men, and therefore it was not unconstitutional for Congress to distinguish between them.

None of this is to say that Congress is free to disregard the Constitution when it acts in the area of military affairs. In that area as any other Congress remains subject to the limitations of the Due Process Clause, but the tests and limitations to be applied may differ because of the military context. We of course do not abdicate our ultimate responsibility to decide the constitutional question, but simply recognize that the Constitution itself requires such deference to congressional choice. [Citations omitted.]

*Rostker v. Goldberg, supra,* 453 U.S. at 66–67, 101 S.Ct. at 2652–2653, 69 L.Ed.2d at 487–488 (1981).